**Christopher GOINS, Petitioner,**

v.

**Ronald G. ANGELONE, Director, Virginia Dept. of Corrections, Respondent.**

**No. Civ.A. 97–1406–A.**

United States District Court, E.D. Virginia, Alexandria Division.

June 10, 1999.

Steven David Benjamin, Richmond, VA, Robert Stanley Powell, Arlington, VA, Frank Salvato, Alexandria, VA, for Christopher C. Goins, petitioner.

Katherine Pharis Baldwin, Office of the Attorney General, Richmond, VA, for Ronald Angelone, Director, Director, Virginia Department of Corrections, respondent.

## MEMORANDUM OPINION

ELLIS, District Judge.

Petitioner Christopher Goins was convicted of capital murder in the Circuit

Court for the City of Richmond on June 13, 1995. A month later, he was sentenced to death for this crime. His direct appeal and collateral attacks in state court having failed, Goins now petitions for a writ of habeas corpus in the federal forum. The matter is before the Court on respondent's motion to dismiss, which, for the reasons set forth here, must be granted.

## I. Facts[1]

Petitioner Christopher Goins and his friend Barry Scott arrived at the Richmond, Virginia, apartment of Tamika Jones and her family on the morning of October 14, 1994. That day, six other members of Tamika Jones' family were present in the apartment, including her parents, Daphne Jones and James Randolph, Jr., her nine-year-old sister Nicole, her four-year-old brother David, her three-year-old brother Robert, and her twenty-one-month-old sister Kenya. Goins and Scott were friends of the Jones family.

At that time, Tamika was fourteen years old and seven months pregnant with Goins' child. She had recently returned home from the hospital after receiving treatment for pregnancy-related complications. On the morning of the murders, Goins apparently became angry when Scott attempted to show Goins an ultrasound photograph of Tamika's fetus. Tamika testified at trial that she heard Goins in the other room saying, "Why you bringing it to me? I don't want to see it. Take it back."

Later that morning Tamika saw Goins briefly in the living room of the family apartment. While she was in her bedroom with her sister, Kenya, she heard him participating in a conversation in the kitchen and then heard rapid gunfire in the kitchen, followed by screams, crying, and the sound of a single set of footsteps in the hall. Tamika then heard more shots and saw "flashes in the hall." Immediately thereafter, she saw Goins appear in the doorway of her bedroom and proceed to shoot her nine times. He also shot her sister, Kenya, whom Tamika had attempt-

ed to shield with her body. As soon as Tamika thought Goins had left the apartment, she called 911 for assistance and told the 911 operator that Goins had shot her. When asked by the operator if anyone was with her, Tamika responded, "Yes, he shot them too."

The police arrived soon thereafter at the Jones' apartment, where they found that the entire family had been shot and only Tamika and Kenya had survived. Daphne had been shot four times, twice in the head, once in the left wrist, and once in the right leg. Both shots to the head were lethal. James Randolph, Jr., was shot nine times, twice in the head, three times in the left arm and chest, once in the abdomen, once in the right arm, once in the left leg, and once on the chin. Four of these wounds were lethal. Four-year-old David died as a result of a lethal gunshot wound to the head, apparently fired at close range. Daphne, James Randolph, Jr., and David were all found in the kitchen.

In a bedroom, police found the bodies of nine-year-old Nicole and three-year-old Robert. Nicole suffered two lethal gunshot wounds: one bullet passed through her heart and a lung and the other bullet was fired into her head at close range. Robert sustained two lethal gunshot wounds to his head.

Kenya sustained a wound measuring between two and three inches long through her left wrist. Tamika was shot three times in her abdomen, three times in her thighs, once in her right hand, once in her neck, and once in her left shoulder. Because multiple bullets had perforated her uterus, her right ovary, and a fallopian tube, Tamika's uterus and one ovary were removed. Her fetus was killed by a gunshot wound to its face.

In the apartment, the police found multiple .45 caliber cartridge casings, various bullets, and bullet jacket fragments. No

---

1. The facts are drawn from the Supreme Court of Virginia's recitation of evidence on direct appeal. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 119–122 (1996).

weapon was found. A firearms identification expert testified at trial that all the recovered bullets, bullet jackets, and jacket fragments were ".45 auto caliber." He also concluded that the bullet jackets were ejected from a firearm constructed by a manufacturer that uses polygonal rifling. Glock, Inc., he stated, is the major manufacturer using this type of rifling in the design of its firearms. A second expert in firearms identification concluded, on the basis of the cartridge casings, that all the bullets used in the shootings were fired from the same .45 caliber Glock pistol.

Police searched the apartment of Monique Littlejohn, Goins' girlfriend, on two occasions. There they found an unfired .45 caliber cartridge that one of the firearms experts testified had been in the same weapon as the cartridge casings found at the crime scene. Also found in Littlejohn's apartment, lying on the floor next to some men's clothing, was an instruction manual for Glock pistols.

Parrish Davis, a cab driver who had known Goins for several months prior to the shootings, testified at trial that about one week before the murders, Goins told him that he was upset because Tamika had become pregnant. Davis stated that Goins told him he "wanted to do away with her and her family." Further, Davis revealed that he and Goins had occasionally discussed .45 caliber pistols. Significantly, Davis also testified that on October 14, 1994, the day of the murders, Goins asked Davis to drive him out of town concealed in the trunk of a friend's car, which Davis refused to do. Approximately a month after the shootings, Goins and Littlejohn were apprehended in New York.

## II. Procedural History

At trial and during sentencing, Goins was represented by appointed counsel Robert Johnson and Susan Hansen. On June 13, 1995, a jury in the Circuit Court of the City of Richmond convicted Goins of one charge of capital murder, four charges of first degree murder, two malicious wounding charges, and seven charges of illegal use of a firearm. In a separate sentencing proceeding, the jury recommended the imposition of the death sentence for the capital murder after finding that Goins' conduct was "outrageously or wantonly vile, horrible, or inhuman" and concluding that he represented a continuing serious threat to society. Va.Code § 19.2–264.2. For the noncapital offenses, the jury sentenced Goins to four life terms plus 78 years in prison. After considering the probation officer's report and conducting a sentencing hearing, the trial court sentenced Goins to death in accordance with the jury's recommendation.

Still represented by Attorneys Johnson and Hansen, Goins appealed his convictions and sentences to the Supreme Court of Virginia. This appeal failed; the conviction and sentence were affirmed by published opinion on April 19, 1996. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 132 (1996). The United States Supreme Court denied Goins' petition for a writ of certiorari on October 7, 1996. *See Goins v. Virginia,* 519 U.S. 887, 117 S.Ct. 222, 136 L.Ed.2d 154 (1996).

Represented by newly-appointed counsel, Goins then filed a 146–page petition for a writ of habeas corpus in the Supreme Court of Virginia on December 6, 1996. The Supreme Court of Virginia directed Goins to refile the petition to conform to the fifty-page limit set by state rules, and Goins complied by filing an amended petition. On May 5, 1997, without conducting an evidentiary hearing, the Supreme Court of Virginia dismissed the amended petition. *See Goins v. Warden,* No. 962477 (Va. May 5, 1997).

Thereafter, on August 14, 1997, the Circuit Court of the City of Richmond scheduled Goins' execution for September 15, 1997. On September 5, 1997, Goins filed a motion in this Court for a stay of execution and appointment of counsel to prepare a federal habeas petition pursuant to 28 U.S.C. § 2254. This Court stayed execution and granted the motion for appointment of counsel on September 11, 1997, and on January 7, 1998, Goins moved for

the appointment of experts and an investigator. The Court denied this motion, without prejudice to Goins' renewal of the motion should circumstances warrant following the filing of the habeas petition and the government's response. Goins then filed his 185–page petition on February 17, 1998, setting out thirty-six grounds for relief as follows:

I. The appointment of unqualified counsel deprived Goins of a fair trial and sentencing;

II. Goins received inadequate assistance of counsel stemming from counsel's inadequate pretrial investigation;

III. The trial court's decision to select the venire from Gloucester County denied Goins the right to an impartial jury and fair trial;

IV. The trial court failed to discharge its duty to select a fair and impartial jury;

V. The trial court improperly denied Goins the opportunity to mail a questionnaire to potential jury members;

VI. The trial court erred in denying additional peremptory challenges;

VII. The trial court improperly limited questions during voir dire;

VIII. The trial court improperly failed to remove three jurors;

IX. Prospective jurors were improperly dismissed for cause;

X. The trial court erred in not allowing Goins to question or educate jurors about parole during voir dire;

XI. The trial court denied fatigued counsel a recess;

XII. Trial counsel failed to provide Goins with effective assistance of counsel during jury voir dire;

XIII. The prosecution failed to produce certain evidence in violation of *Brady* and the trial court's discovery order and presented a false theory of the case;

XIV. The trial court improperly admitted testimony and physical evidence that inflamed the jury and resulted in a sentence based on the influence of passion, prejudice, and other arbitrary factors;

XV. Goins' rights were violated by his absence from critical stages of his trial and his counsel's ineffectiveness relative to this absence;

XVI. Goins received ineffective assistance of counsel during trial;

XVII. Goins received ineffective assistance of counsel at sentencing;

XVIII. Goins received ineffective assistance of counsel with regard to counsel's selection of Dr. Nelson and counsel's interaction with and supervision of Dr. Nelson;

XIX. Trial counsel failed to raise the issue of interference in the attorney client relationship by a cooperating informant;

XX. Trial counsel failed to move to withdraw after the conflict between Goins and trial counsel became apparent;

XXI. Both trial counsel failed to communicate adequately and share critical information with each other;

XXII. Goins' rights under the Eighth and Fourteenth Amendments were violated by the exclusion of evidence of parole eligibility;

XXIII. The Due Process Clause required that the jury be presented with evidence of Goins' ineligibility for parole release;

XXIV. Christopher Goins' death sentence was substantially based on unadjudicated allegations of criminal misconduct in violation of his rights to due process and against cruel and unusual punishment;

XXV. The inadequate consideration of mitigation evidence;

XXVI. The evidence was insufficient as a matter of law to establish the aggravating factors of vileness and future dangerousness;

XXVII. The evidence of guilt was insufficient as a matter of law;

XXVIII. Prosecution witnesses were untruthful in their testimony;

XXIX. The prosecution failed to disclose evidence of an unlawful search;

XXX. Jury misconduct;

XXXI. Virginia's capital sentencing statute is unconstitutional;

XXXII. The Supreme Court of Virginia provided inadequate and meaningless appellate review of the appropriateness of the death penalty;

XXXIII. Failure to perform constitutionally adequate proportionality review;

XXXIV. Appellate counsel provided ineffective assistance of counsel;

XXXV. Imposition of the death penalty constitutes cruel and unusual punishment; and

XXXVI. Trial counsel's affidavits are illegal and improper.

After filing the petition, Goins again moved for discovery and appointment of experts. Respondent opposed Goins' motions and moved to dismiss the petition.

### III. Exhaustion

All of Goins' thirty-six habeas claims have been "exhausted" within the meaning of 28 U.S.C. § 2254(b), either because they were presented to the Supreme Court of Virginia on direct appeal or habeas review or because they have never been presented to the Supreme Court and cannot be presented to that court now under Virginia Code § 8.01–654(B)(2), which section generally prohibits successive habeas petitions.[2]

### IV. Procedural Default

■ Habeas claims, even though "exhausted" under § 2254(b), may not be reviewed on the merits if they have been procedurally defaulted. In this regard, there are two distinct procedural default standards, one set forth in 28 U.S.C. § 2264(a), enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the second, the pre-AEDPA standard, set forth in *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The first step in the procedural default analysis is to determine which of these default standards applies here.

■ The AEDPA standard is set out in 28 U.S.C. § 2264(a),[3] but because Virginia is not an "opt-in" state pursuant to 29 U.S.C. § 2261, § 2264 is not applicable to capital habeas petitioners in Virginia. *See Cardwell v. Netherland*, 971 F.Supp. 997, 1013 n. 21 (E.D.Va.1997), *aff'd sub nom. Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998), *cert. denied* —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998). Goins' claims are thus properly examined under *Coleman*, which teaches that when a federal habeas petitioner defaults a federal claim under an independent and adequate state procedural rule, federal review of the defaulted claim is generally barred, unless (i) there is cause for, and actual prejudice from, the default or (ii) failure to review the claim would result in a fundamental miscarriage of justice. Pertinent in this regard is the fact that the Supreme Court of Virginia held that ten of Goins' state habeas claims, raised again in his federal petition, were procedurally defaulted under the rule of *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974). *Slayton* bars state habeas review of those claims that were available to petitioner at trial or on direct appeal and that petitioner failed to raise at that time.[4] Nor is there any

2. Moreover, under 28 U.S.C. § 2254(b)(2), a federal district court may deny (but not grant) even those claims that have not been exhausted.

3. 28 U.S.C. § 2264(a) provides that a district court may not consider any claim that has not been raised and decided on the merits in state court unless the failure to raise the claim properly is (1) the result of state action in violation of the Constitution or laws of the United States; (2) the result of the Supreme Court's recognition of a new federal right that is made retroactively applicable; or (3) based on a factual predicate that could not have been discovered through the exercise of due diligence in time to present the claim for state or federal post-conviction review.

4. The ten federal habeas claims to which the Supreme Court of Virginia applied *Slayton* are (1) claim I: The appointment of unqualified counsel deprived Goins of a fair trial and sentencing (state habeas claim IIA); (2) claim III: The trial court's decision to select the venire from Gloucester County denied Goins

doubt, as the Fourth Circuit has consistently found, that the *Slayton* rule constitutes an independent and adequate state procedural rule for the purposes of federal habeas procedural default analysis. *See, e.g., Fisher v. Angelone,* 163 F.3d 835, 844 (4th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1290, 143 L.Ed.2d 382 (1999).

▆▆▆ Goins concedes, as he must, that he has defaulted the ten claims. Even so, he contends that his default is nevertheless excusable under both exceptions articulated in *Coleman.* Specifically, Goins asserts that the challenged claims must be considered or a miscarriage of justice will result, as the allegations in his petition reveal probable actual innocence of the murders or probable actual innocence of a death sentence. To be sure, when a habeas petitioner demonstrates that a constitutional error probably resulted in the conviction of one who is in fact innocent, or presents clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty, then any defaulted procedural claims challenging these constitutional errors must be considered to prevent a miscarriage of justice. *See Schlup v. Delo,* 513 U.S. 298, 323–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In this case, while Goins asserts conclusorily that such errors exist, he has proffered no facts in his petition from which it can be reasonably concluded (1) that there is a probability he is innocent of the murders or innocent of the death penalty and (2) that any of the ten alleged errors mistakenly led to his conviction and sentence. Thus, Goins

has failed to demonstrate that enforcement of the procedural default rule will result in any miscarriage of justice in this case.

▆▆▆ Goins also asserts that he should receive merits review of the ten defaulted claims because ineffective assistance of counsel constituted cause for the default and because prejudice flowed from the default. It is true that in a federal habeas proceeding constitutionally ineffective assistance of counsel, if established, can serve as cause to excuse a procedural default, provided that the ineffective assistance of counsel claim is first presented to, and exhausted in, the state courts. *See, e.g., Justus v. Murray,* 897 F.2d 709, 712 (4th Cir.1990). In this sense, Goins did present and exhaust nine of the ten otherwise defaulted claims; that is, he included among his state habeas claims the failure of his trial and appellate counsel to raise the nine procedurally defaulted claims.[5] The ineffective assistance of counsel in failing to preserve or advance the remaining nine claims is also argued in freestanding claims in the federal habeas petition. Nevertheless, for the reasons set forth *infra* in the discussion of the ineffective assistance claims, in each instance either the failure to raise the claims was not objectively unreasonable, or no prejudice to Goins flowed from the failure to present the claims.

▆▆▆ Finally, respondent notes that Goins has never previously raised in any state court proceeding Claim XXXIV(1)(i), which alleges that appellate counsel was ineffective for failing to argue that the

---

the right to an impartial jury and fair trial (state habeas claim IID); (3) claim VIII: The trial court improperly failed to remove three jurors (state habeas claim IIE1); (4) claim IX: Prospective jurors were improperly dismissed for cause (state habeas claim IIE2); (5) claim XI: The trial court denied fatigued counsel a recess (state habeas claim IIE3); (6) claim XIV(3): The trial court improperly admitted testimony concerning the fetus that was designed to inflame the jury and resulted in a sentence based on the influence of passion, prejudice, and other arbitrary factors (state habeas claim IIG); (7) claim XV: Goins'

rights were violated by his absence from critical stages of his trial (state habeas claim IIF); (8) claim XXV: The inadequate consideration of mitigation evidence (state habeas claim IIK); (9) claim XXVI: The evidence was insufficient to establish vileness and future dangerousness (state habeas claim IIJ); and (10) claim XXX: Jury misconduct (state habeas claim IV).

**5.** Goins failed to raise the tenth claim, regarding jury misconduct. As a result, consideration of this claim (Claim XXX) is properly barred under the procedural default rule.

Supreme Court of Virginia's proportionality review is unconstitutional because the court gives no notice of the factors used in the review. As a result, the claim must fail here, since a Virginia inmate seeking a writ of habeas corpus in federal court procedurally defaults any claim he neglects to raise in direct or collateral state proceedings. *See Bassette v. Thompson,* 915 F.2d 932, 937 (4th Cir.1990). This is because Virginia law clearly states that no writ of habeas corpus shall be granted "on the basis of any allegation of facts of which petitioner had knowledge at the time of filing any previous petition." Va.Code § 8.01–654(B)(2). And, since Goins neither alleges cause for the default, nor has he shown that this alleged error resulted in his conviction though he was actually innocent, there is no obligation here to consider the application of either exception to the procedural default rule. *See, e.g., Wright v. Angelone,* 151 F.3d 151, 160 (4th Cir.1998).

In sum, Claims I, III, VIII, IX, XI, XIV(3), XV, XXV, XXVI, XXX, and XXXIV(1)(i) are procedurally defaulted, and Goins has failed to demonstrate either cause and prejudice for the default or a miscarriage of justice. Accordingly, these claims must be dismissed.

### V. Merits Review

Goins seeks an evidentiary hearing on the merits of the preserved claims. *Cardwell v. Greene,* 152 F.3d 331, 338 (4th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998), established that a petitioner, when denied the opportunity to develop an evidentiary basis for his claims in state court, has not thereby "failed" to do so under 28 U.S.C.

§ 2254(e)(2) [6] and hence is entitled to such a hearing when the petitioner alleges "additional facts that, if true, would entitle him to relief." If a petitioner fails to forecast such evidence, denial of the request for an evidentiary hearing is proper. *See Cardwell,* 152 F.3d at 338.

■ Goins, it seems clear, did not *fail,* under § 2254(e)(2), to develop an evidentiary basis for his claims; he was *precluded* from doing so by the Supreme Court of Virginia's summary denial of a hearing for this purpose. It follows, then, that Goins may obtain a hearing here if he alleges or forecasts additional facts that, if true, would merit relief. Because Goins has failed to allege or forecast such facts, as the following discussion discloses, he is not entitled to an evidentiary hearing. Therefore, the merits of Goins' claims will be assessed on the basis of the existing record.

### 1. Ineffective Assistance of Counsel

The Supreme Court of Virginia rejected Goins' state habeas ineffective assistance of counsel claims on the merits, citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Section 2254(d)(1) of the AEDPA provides that an application for a writ of habeas corpus "shall not be granted" if there was a merits adjudication in the state court unless that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**6.** This section provides that evidentiary hearings in federal court shall be available only in strictly limited circumstances when the applicant has failed to develop the claim in state court. Specifically, an evidentiary hearing is available only when (1) the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavail-

able" or "a factual predicate that could not have been previously discovered through the exercise of due diligence" and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable juror would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1).

■ Goins' ineffective assistance of counsel claims were clearly "adjudicated on the merits" by the Supreme Court of Virginia, although the court did not disclose its reasons for rejecting Goins' claims. Under the statute, the question is thus "whether the state court decision rests upon an objectively unreasonable application of established principles to new facts," *Cardwell,* 152 F.3d at 339, or specifically in this instance, whether the Supreme Court of Virginia unreasonably applied the *Strickland* standard. Of course, "[w]here, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record." *Id.* In these circumstances, "the distinction between de novo review and 'reasonableness' review becomes insignificant." *Id. see also Wilson v. Moore,* 178 F.3d 266, 280 (4th Cir.1999). In short, this Court must independently evaluate whether (i) the attorney performance in issue alleges falls below an objective standard of reasonableness and (ii) whether there is a reasonable probability that had counsel not committed errors falling below this objective standard, that the results of Goins' trial or sentencing would have been different. *See Bell v. Evatt,* 72 F.3d 421, 427 (4th Cir.1995).

### A. Claim II: "Goins received ineffective assistance of counsel stemming from trial counsel's inadequate investigation."

Goins alleges that his trial counsel failed to consult with him adequately prior to trial, meeting with him only a few times a month between their appointment on February 8, 1995, and the trial's commencement in June 1995. He notes that after Attorneys Hansen and Johnson were appointed in February, a month passed before they filed any discovery. He further alleges that Attorney Johnson, who was primarily responsible for the guilt phase of the trial, never interviewed witnesses to assess their credibility or the strength of their information, nor did he conduct any other investigation concerning the facts of this case. Instead, according to Goins, Attorney Johnson deferred to the judgment of the Public Defender's investigator working on the case in deciding whether to call various persons as witnesses. Goins also alleges that his attorneys failed to investigate adequately their chosen theory of defense, namely that Barry Scott committed the murders, by (i) failing to investigate whether Scott owned or possessed a firearm prior to the incident, (ii) failing to investigate the white canvas bag Scott allegedly brought to the apartment for trace evidence of a firearm, (iii) failing to examine latent prints on the drugs found on James Randolph's body to establish Scott's drug dealing and motive for the shooting, and (iv) failing to ascertain from government investigators whether Scott's residence was searched for the murder weapon.[7] In addition, Goins claims that trial

---

**7.** Respondent incorrectly contends that many of the facts alleged in support of this claim may not be introduced here because they were not raised in the state habeas proceeding. To the contrary, Goins' state habeas petition alleges that trial counsel failed to interview and consult with Goins adequately before trial, that trial counsel failed to consult with Goins about information disclosed shortly before the trial, that trial counsel were deficient in developing and presenting exculpatory evidence, that trial counsel failed to interview witnesses, and that trial counsel improperly deferred to the decision of the Public Defender investigator in deciding whether to call witnesses. Also contained in the state habeas petition is the allegation that trial counsel failed to investigate evidence suggesting Scott was the killer. Thus, while the federal habeas petition adds some details—for example, listing the particular dates on which trial counsel consulted Goins prior to trial—the essential facts of this claim were squarely presented in Goins' state habeas petition, and thus federal review of this claim and the supporting allegations is not barred.

counsel rendered ineffective assistance as a result of their failure to conduct an adequate investigation of methods for impeaching a prosecution witness, their failure to investigate the credentials of their chosen expert, and their failure to uncover various evidence in mitigation.

On the merits, the claim fails both because in some instances Goins cannot establish that trial counsel's performance fell below an objective standard of reasonableness and because, even assuming this were established, Goins, in all instances, fails to show that any such deficiencies prejudiced either the trial or the sentencing. This is illustrated by an examination of each of the alleged deficiencies.

First, Goins asserts that trial counsel failed to interview witnesses, delegating this task to an investigator. The record refutes this assertion; while Attorney Johnson may well have delegated this task, according to trial counsel's affidavit, Attorney Hansen participated in interviewing "most, if not all, potential witnesses." These facts do not support a claim of deficient performance in this respect. Nor is there any persuasive showing that trial counsel's actions prejudiced the trial or sentencing.

Goins also alleges that trial counsel were deficient in their investigation of their chosen defense, namely, that Scott, not Goins, was the murderer. Specifically, Goins alleges that trial counsel (i) never investigated whether Scott possessed a firearm prior to the murders; (ii) never investigated the white canvas laundry bag that Scott brought to the Jones apartment that day for trace evidence of a firearm; (iii) did not attempt to link Scott

to the drugs found on James Randolph through an examination of latent fingerprints; (iv) did not attempt to find or test clothing worn by Scott on the day of the shooting for blood or gunpowder residue; and (v) did not question police investigators about whether Scott's residence was ever searched for the murder weapon. In their affidavit, Attorneys Johnson and Hansen state that attempts to find and test clothing worn by Scott on the day of the shootings would have been pointless since Scott turned himself into police several days after the murders, when he would have had ample time to discard or wash the clothing. They also state that it would have been pointless to question police investigators about whether Scott's apartment was ever searched for a murder weapon, since they were aware through monitoring filings in the clerk's office that no warrants for any such searches had been issued. Given *Strickland*'s strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, it cannot be said that trial counsel's investigation of Scott was so negligent as to constitute ineffective assistance.[8] In addition, there is no evidence that if trial counsel had undertaken the further investigation. Goins specifies, they would have discovered that Scott possessed a firearm which, at some point, he had carried in the white canvas bag. And, even had their investigation revealed such evidence, it is unlikely that this evidence would have overcome the inferences from Tamika's testimony that she heard gunshots and a single set of footsteps immediately before Goins appeared in her doorway and shot her and her sister. *See, e.g., Huffington v. Nuth*, 140 F.3d 572, 582 (4th

---

8. Of course, while Scott had ample time and opportunity to wash clothing and discard other evidence before he turned himself into the police, this does not guarantee that he would have done so. In addition, monitoring the filings in the clerk's office to determine whether searches had occurred was an imperfect system, since no warrants would have been filed if investigators had conducted a consensual search of Scott's apartment. If a consensual search occurred and the murder weapon or any other exculpatory evidence had been found, the prosecution would have been compelled to share such evidence with trial counsel under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To be sure, a more thorough investigation would have been preferable in the circumstances. Nevertheless, any defects in trial counsel's performance in this regard were not so gross as to fall outside the wide range of reasonable professional assistance.

Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 444, 142 L.Ed.2d 399 (1998) (finding that failure to call rebuttal witness, even if objectively unreasonable, was not prejudicial in light of the overwhelming evidence against defendant).

Goins also faults trial counsel for failing to investigate both the testimony that would be given by Parrish Davis, a witness for the prosecution, and the potential for impeaching Davis. According to trial counsel's affidavit, which is not disputed by Goins, when Davis's name first appeared on a prosecution witness list, the attorneys asked Goins who he was, and Goins said only that he thought he was a cab driver. Not until Davis took the stand did Goins tell counsel that Davis had picked him up in his cab the night of the murders. Trial counsel aver that Goins had never mentioned Davis before. At trial, Davis testified that Goins had told him shortly before the murders that he wanted to "do away with" Tamika and her family because she was pregnant by Goins. He further testified that Goins asked him on the evening of the murders to conceal Goins in the trunk of the car and drive him out of town. Goins now argues that an investigation of Davis would have disclosed involvement in ongoing criminal activity, including embezzlement and participation in drug trafficking, and that this information could have been used to impeach Davis.

 To be sure, a defense counsel "ordinarily has a duty to investigate possible methods for impeaching prosecution witnesses." *Hoots v. Allsbrook,* 785 F.2d 1214, 1221 (4th Cir.1986). In some instances, a failure to undertake this investigation may constitute ineffective assistance. *See id.* In failing to investigate avenues for impeaching Davis, trial counsel arguably breached their professional obligations.[9] In this instance, however, Goins has failed to show prejudice arising from this breach. Even without undertaking the relevant investigation, trial counsel were able to locate and introduce evidence that there were no fares recorded for Davis's cab substantiating his testimony that he had picked up Goins at the times alleged. Counsel were thus able to argue to the jury that either Davis had not picked up Goins at the times alleged or he had picked up Goins, but lied to his cab company. Through this evidence, counsel *were* able to cast some doubt upon Davis's testimony and trustworthiness. In addition, there is no reasonable probability that if counsel had been able to impeach Davis with evidence of his criminal activity, Goins would not have been convicted. Evidence of participation in drug trafficking or embezzlement would not have directly implicated Davis's testimonial trustworthiness, as would, for instance, a perjury conviction,[10] and while it is possible such evidence could have led the jury to discredit Davis's testimony, "[u]nder *Strickland,* a mere possibility that the result might have been different does not suffice." *Id.* (holding that defense's failure to impeach prosecution witness through introduction of prior worthless check convictions not prejudicial). Instead, Goins must show a "reasonable probability" that a different result would have occurred in the absence of counsel's error. He has failed to make this showing.

Goins' next ineffective assistance argument focuses on trial counsel's selection of Dr. Evan Nelson as an expert mental health examiner. This selection amounted

9. Goins also argues that trial counsel were ineffective because they did not interview Davis and were surprised by his testimony. Goins does not indicate, however, what counsel would or should have done differently had they been forewarned of Davis's testimony, and thus Goins fails to show prejudice arising from this claim.

10. *See Hoots,* 785 F.2d at 1221 ("Had [the witness] been convicted of perjury or another crime that directly called into question the reliability of her testimony [rather than worthless check charges], we might find that [petitioner] had shown a reasonable probability that but for the failure to impeach, the outcome of the trial might have been different.").

to ineffective assistance, Goins argues, given Dr. Nelson's lack of experience in general and in capital cases specifically. This argument is frivolous, as Dr. Nelson's *vita* reflects that he was fully and amply qualified to serve as a mental health expert in this matter.[11]

■ Finally, Goins argues that Attorneys Johnson and Hansen were ineffective because of their failure adequately to investigate mitigating evidence, including Goins' family background, medical and psychiatric history, and social history. Goins states that on May 8, 1995, trial counsel received a report from investigators that indicated, based on interviews with Goins' mother, stepfather, great aunt, maternal uncle, maternal aunt, and stepbrother, as well as review of Goins' school records and the reports of the public defender investigator, that Goins had grown up in a family characterized by drug abuse and neglect. Goins now challenges his attorneys' failure to conduct further investigation into psychiatric problems suffered by members of Goins' family and emotional neglect experienced by Goins in childhood. In addition, Goins argues that counsel should have further investigated Goins' own psychiatric history, and specifically faults his attorneys' failure to seek the results of a psychological examination of

Goins performed when he was seven years old.

Goins' claim fails; he does not show that his counsel were ineffective in this regard. While trial counsel's investigation of Goins' mother's psychiatric history might have been more thorough, the information they obtained adequately established the effect on Goins of his mother's chemical dependency and psychiatric difficulties. Specifically, the information trial counsel obtained revealed that she never gave Goins attention or affection, that she neglected him and failed to seek prompt medical attention for him when necessary, and that she had used cocaine and alcohol throughout his life. Any further details about the precise nature of his mother's infirmities would seem only cumulative, demonstrating difficulties faced by her, not by Goins. Similarly, information about a childhood psychological evaluation of Goins, even assuming such records still existed, was also at best cumulative, given that Goins' attorneys had retained the services of an expert who was able to speak to Goins' current psychological state. As a result, there is no indication either that a failure to seek out this information should be characterized as objectively unreasonable or that such a failure was prejudicial to Goins.[12]

In summary, Goins has failed to demonstrate inadequate investigation by his attorneys under the *Strickland* standard.

---

**11.** Specifically, according to his *vita*, Dr. Nelson is a licensed clinical psychologist who received his Ph.D. from the University of North Carolina at Chapel Hill and completed postdoctoral work in forensic and clinical psychology. In addition to extensive experience and training in forensic psychology generally, Dr. Nelson completed training in capital sentencing evaluations at the Institute of Law, Psychiatry, and Public Policy in Charlottesville, Virginia, and has provided training to mental health professionals on capital sentence rebuttal evaluations at the Institute of Law, Psychiatry, and Public Policy. In addition, prior to his appointment as an expert witness in Goins' trial, he had served as an expert in other capital trials.

**12.** *See generally Williams v. Taylor*, 163 F.3d 860, 867–69 (4th Cir.1998), *cert. granted*, —

U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999) (finding that given the overwhelming evidence supporting the imposition of defendant's death sentence, counsel's failure to investigate and present mitigating evidence of the abuse and neglect defendant suffered in childhood and defendant's low I.Q. was not prejudicial); *Wright v. Angelone*, 151 F.3d 151, 161 (4th Cir.1998) (noting that because "[f]ailure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further, [while] the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also," the best course for a federal habeas court is to credit "plausible strategic judgment" of trial counsel).

B. *Claim XII: "Trial counsel failed to provide Christopher Goins with effective assistance of counsel during jury voir dire."*

a. *Failure to challenge jurors for cause.*

■ Goins first argues that trial counsel should have moved to dismiss juror Dickey for cause. When Attorney Johnson asked, "Do you believe that defendants in criminal trials should have to prove that they're innocent?" Ms. Dickey responded affirmatively. She repeated her answer when the question was asked again, and then stated that the prosecution has "to prove without a doubt that he's guilty and [the defense] prove[s] without a doubt that he's innocent." Nevertheless, when the burden of proof in a criminal trial was again explained to her, she amended her statement, saying, "No; I don't think they have to prove—I think when they come into court, the [sic] should be innocent until proven guilty.... That's the way I feel. You know, I don't think when he comes into court, we should label him and say, boom; he's guilty." Later, when Attorney Johnson asked whether she would hold it against the defendant if the defense presented no evidence at all, she responded, "Well, I wouldn't think that he's guilty unless I heard the evidence against him was more than you guys could prove." Attorney Johnson then asked whether she would expect the defense to prove that the prosecution was wrong, and Ms. Dickey responded, "I would think so." The trial court then reprimanded Attorney Johnson for asking confusing questions, and Attorney Johnson conceded he was having some difficulty articulating the point. Ms. Dick-

ey ultimately served as a juror in Goins' trial.

Goins argues that Ms. Dickey's responses demonstrated a biased attitude toward Goins and a fundamental misunderstanding of the relevant burdens, revealing that she was unable to maintain impartiality and follow the instructions of the court and her oath as a juror. He contends that Attorney Johnson was ineffective for failing to move for Ms. Dickey's dismissal for cause. Yet, the record shows that Ms. Dickey immediately corrected her answers upon further questioning, and her later statement that she would expect the defense to prove that the prosecution wrong was given in answer to a question that both the trial judge and Attorney Johnson recognized was confusing. Since the exchange taken as a whole did not demonstrate Ms. Dickey's bias, trial counsel's failure to move that she be dismissed for cause was not ineffective.[13] *Cf. Bunch v. Thompson,* 949 F.2d 1354, 1367 (4th Cir. 1991) ("Although both potential jurors initially agreed with the statement that the death penalty should be imposed in every case of murder ... both changed their positions upon immediate requestioning. Failure to strike the potential jurors for cause did not lead to a fundamental miscarriage of justice where, as here, they stated their ability to consider fairly and impartially sentences besides death."); *Bell v. Lynaugh,* 828 F.2d 1085, 1092 (5th Cir.1987) ("Although Branch testified that she would require appellant to present evidence before she would find him not guilty, she also testified that she would not hold against appellant the possibility that he

---

**13.** In addition, other of Ms. Dickey's answers may have made her an attractive witness to trial counsel, providing strategic motivation to their decision not to move for her dismissal. For instance, Ms. Dickey stated that she believed that traumatic childhood experiences could influence a person as an adult, indicating some receptiveness to the notion that Goins' responsibility for his crimes might be mitigated by his difficult childhood. She also indicated that a member of her family had experienced a problem stemming from illegal drugs and stated that "there's both sides of life; and I've seen it; and I know it," which response perhaps suggested that she would not assign undue weight to evidence that crack had been found on Goins' person at one time. Finally, when asked whether she would automatically vote to impose the death penalty if Goins were found guilty of capital murder, she responded that she did not "automatically do anything," thus suggesting that she would be a thoughtful, reflective juror.

might not testify and might not present any evidence. This subsequent clarification ... suggests that Branch could be a fair and impartial juror and ... justifies the trial judge's denial of appellant's motion to strike Branch for cause.").

■ ▇▇▇▇ The conclusion that Ms. Dickey was not biased is strengthened by the fact that the trial court apparently came to the same conclusion. Federal habeas courts apply a presumption of correctness to a trial court's determination that a juror is qualified to serve. *See Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Here, since trial counsel made no motion to dismiss Ms. Dickey for cause, the trial court did not explicitly rule that Ms. Dickey was unbiased and impartial. Even so, the trial court's empaneling of Ms. Dickey implicitly demonstrates that the trial court made this determination. Given that such a determination "is essentially one of credibility, and therefore largely one of demeanor," the trial court's resolution of this issue is entitled to "special deference." *Id.* This deference applies with special force in instances where, as here, prospective jurors give ambiguous or contradictory answers during voir dire examination, as the trial judge is in the best position to determine which answers accurately reflect a juror's understanding and belief. *See id.* at 1039, 104 S.Ct. 2885. While not determinative, the fact that the trial court allowed Ms. Dickey to be empaneled supports the conclusion that Attorney Johnson was not ineffective for failing to move for her dismissal.

▇▇▇▇ Goins further claims that Attorney Johnson was ineffective for failing to move to dismiss juror Hogge. Ms. Hogge, who revealed during voir dire that she had been the victim of a violent crime, initially stated that she did not know whether this experience would affect her judgment in the current matter. Upon further questioning, however, she stated she would be able to put this experience aside and base her decision solely on what she heard in the courtroom, without being influenced by her own experience. Later, when asked if she had heard any conversations about the case that day in the courthouse, she stated the she had heard "[t]hat [Goins] had killed people," but affirmed that these overheard conversations would make no difference to her deliberations. In no way did Ms. Hogge's responses demonstrate bias against Goins, and her answers in voir dire revealed her understanding that her deliberations as a juror were to be based only on the evidence before her. Thus, trial counsel's decision not to seek her dismissal for cause was objectively reasonable. *See Bunch,* 949 F.2d at 1367.

▇▇▇▇ Finally, Goins argues that juror Anderson should have been challenged for cause because she stated that she had received information about the case from a co-worker. Yet, Goins fails to note that Ms. Anderson further stated that she had formed no opinion about the case based upon these statements, had no preconceived notions as to the guilt or innocence of the defendant, and knew of no reason, biases, or prejudices that would interfere with her ability to sit in the case, listen to the evidence, consider only the evidence that came out in the case, and give the defendant a fair trial based only on the law and the evidence. Ms. Anderson thus clearly stated that she was able to consider the facts in Goins' case without preconceptions or prejudices and that she would base her verdict only on the law and evidence introduced at trial. Trial counsel's failure to move for her dismissal for cause was not ineffective assistance, since the record supports the conclusion that the juror was impartial. *See Adams v. Aiken,* 965 F.2d 1306, 1317 (4th Cir.1992), *vacated on other grounds and remanded,* 511 U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994), *aff'd* 41 F.3d 175 (1994).

b. *Failure to object to the improper dismissal of prospective jurors who expressed reservations about the death penalty.*

▇▇▇▇ Goins contends that prospective jurors Brownlee and Williams were

improperly dismissed by the trial court when they did not express an immediate willingness to impose the death penalty and that trial counsel's failure to challenge these dismissals was ineffective. In such cases, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Mackall v. Angelone,* 131 F.3d 442, 450 (4th Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998) (quoting *Morgan v. Illinois,* 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). A juror who would not vote for capital punishment in any case regardless of the instructions he or she receives is not impartial and must be removed for cause. *See id.* Here, when asked whether she could impose the death penalty in a proper case, Ms. Brownlee stated that she did not think she could. Given this, the trial court's dismissal of Ms. Brownlee was plainly justified.

Mr. Williams was also asked repeatedly whether he could impose the death penalty if the prosecution carried its burden, and each time he answered that he did not know if he could. At no time during questioning did Mr. Williams affirm that under appropriate circumstances, he would vote for imposition of capital punishment. While Mr. Williams' responses were more equivocal than Ms. Brownlee's, his answers in voir dire demonstrated that he was unsure that he would be able to follow the law and the court's instructions in this case. Accordingly, his dismissal for cause was justified, and trial counsel's failure to object to this dismissal did not constitute ineffective assistance.

c. *Failure to ask prospective jurors whether they would be willing to consider Goins' age as a reason not to impose the death penalty.*

In voir dire, the prosecutor repeatedly asked prospective jurors whether the fact that Goins was twenty-one-years old at the time of trial would prevent them from imposing the death penalty. Multiple prospective jurors, including eight jurors ultimately empaneled in this case, two alternate jurors, and three jurors removed by the defense through peremptory strikes, answered that the defendant's age would not prevent them from imposing the death penalty. Goins now argues that Attorney Johnson should have ensured through voir dire questioning that potential jurors would be willing to *consider* Goins' age as a reason not to impose the death penalty, since the age of the defendant is a statutorily-prescribed mitigating factor. In effect, Goins argues that trial counsel did not conduct a voir dire adequate to qualify the jury in a capital case.

This argument founders on recent circuit authority. In *Yeatts v. Angelone,* 166 F.3d 255, 262–66 (4th Cir.1999), *cert. denied,* —— U.S. ——, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999), as here, a habeas petitioner sought relief on the ground that trial counsel provided ineffective assistance when he failed to conduct voir dire sufficient to determine whether jurors would consider mitigating circumstances in determining the sentence of a capital defendant. The panel rejected this claim, holding that voir dire regarding jurors' willingness and ability to impose the death penalty is sufficient to protect a capital defendant's Sixth and Fourteenth Amendment rights when jurors are asked (i) whether they have any opinion that would prevent them from convicting anyone of an offense punishable with death; (ii) whether, if they found the defendant guilty of capital murder, they could never vote to impose the death penalty or even consider its imposition; and (iii) whether, if they found the defendant guilty of capital murder, they would be able to consider voting for a sentence less than death. *See id.* No further questions are constitutionally required to "death qualify" a jury, and counsel cannot be constitutionally ineffective for failing to ask further questions regarding the jurors' opinions on possible mitigating and aggra-

vating circumstances. *See id.* Under *Yeatts,* trial counsel's decision not to ask jurors whether they would consider age as a mitigating factor does not amount to constitutionally ineffective assistance.

### d. Trial counsel failed to conduct adequate voir dire.

■ Trial counsel moved for sequestered voir dire, and the trial court denied this motion in part and granted it in part, initially questioning jurors in groups of three, then increasing the groups to five, and finally to thirteen. Although Goins' attorneys objected to these increases in group size, the trial court overruled the objection. Goins now claims that trial counsel's memorandum on the sequestration issue was cursory and ineffective, yet he identifies no issue or precedent that the memorandum failed to address. His claim is frivolous. Counsel moved for sequestered voir dire and objected when jurors were questioned in larger groups. *Strickland* does not permit a finding that trial counsel were ineffective based on vague assertions that they should have filed a more eloquent or extensive memorandum in support of a motion. *See Strickland,* 466 U.S. at 686–91, 104 S.Ct. 2052.

■ In addition, Goins argues that when the trial court denied trial counsel's request to mail a questionnaire to all prospective jurors, Attorney Johnson had a duty to redraft the questionnaire, removing cumulative and objectionable questions, and to renew the motion to use the questionnaire. Yet counsel already had renewed the motion once, and in addition presented a letter from a jury selection expert detailing the need to use a questionnaire to ensure accurate and candid answers from jurors. Attorney Johnson's choice to abandon the questionnaire in the face of two denials by the trial court cannot be termed objectively unreasonable. Moreover, even assuming the contrary, this claim still fails because no prejudice from the failure to distribute the questionnaire has been shown. In other words, in no way did counsel's conduct here so undermine the proper functioning of the ad-

versarial process that the trial cannot be relied upon as having produced a just and reasonable result. *See Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

Similarly, Goins claims that Attorney Johnson's failure to renew a motion for additional peremptory challenges that had already once been denied by the trial court constitutes ineffective assistance of counsel. This claim's lack of merit is too apparent to require further discussion.

Trial counsel also sought, by motion, to question potential jurors about their beliefs regarding Goins' potential parole eligibility were he to be convicted and the effect of these beliefs on their ability to be impartial. The trial court denied this motion. Goins now claims that the motion constituted ineffective assistance of counsel because it stated, incorrectly, that Goins, if convicted, would be eligible for parole in twenty-five years, when in fact, Goins would not be eligible for parole for thirty years. This contention is patently frivolous, since even if trial counsel's five-year miscalculation fell below an objective standard of reasonableness, no possible prejudice could have resulted from the mistake; it strains credulity to imagine that the trial court determined whether to allow the questions based on a misapprehension as to the proper parole eligibility term.

■ In addition to parole eligibility questions, trial counsel, relying in part on the testimony of a jury selection expert, sought to ask prospective jurors a variety of other questions that were disallowed by the trial court. In this regard, Goins claims that counsel failed adequately to articulate why these questions were relevant and necessary to determine jurors' impartiality, yet he points to no specific flaw or errors in his attorneys' performance in this regard. Again, Goins attempts to argue that his trial counsel were constitutionally ineffective solely because their arguments did not succeed; this contention must fail. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("[I]t is all too easy

for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

Lastly, Goins contends that trial counsel failed to seek a recess when their fatigue impaired their participation in the jury voir dire process. Goins neither substantiates the claim that trial counsel were impaired by fatigue, nor does he articulate how such fatigue prejudiced him. He thus fails to establish this claim.

C. *Claim XVI. "Goins received ineffective assistance of counsel during trial."*

a. *Failure to present a defense.*

The defense theory, as articulated in Attorney Johnson's opening statement and closing argument, was that Barry Scott, not Goins, committed the murders. In the opening statement, Attorney Johnson alerted the jury to certain questions that when applied to the evidence presented would, he suggested, raise a reasonable doubt as to whether Scott or Goins committed the murders.[14] Goins now argues that trial counsel essentially promised to present evidence on these questions, yet ultimately failed to introduce evidence sup-

porting this defense and failed to provide the jury with answers to the questions raised in opening statements. Specifically, Goins argues that the defense failed to subpoena Scott as a witness,[15] failed to introduce evidence of Scott's contradictory statements to police,[16] failed to introduce evidence that Scott was a drug dealer, failed to introduce evidence that Scott's bond was reduced based on an agreement with the Commonwealth after he cooperated with the authorities, and failed to bring forward evidence of Scott's past history of violence and previous criminal convictions. Goins also argues that the failure to call Scott as a witness left trial counsel unable to point out inconsistencies between Tamika's and Scott's version of events in the Jones apartment that morning (*e.g.,* Tamika testified the gun Goins used was black, while Scott said in a police statement the gun Goins used was gray; Tamika testified that she heard Goins ask her mother for a glass of water immediately prior to the shootings, Scott mentioned no such conversation in his statements). Goins argues that by failing to call Scott as a witness or introduce the relevant evidence, his counsel failed to present the only available defense.

**14.** The relevant portion of Attorney Johnson's opening statement is as follows:

[A]s you go through those portions of the trial, I want you to pay particular attention to the facts that come out. And I want you to took for facts that might answer certain questions. Those questions are: Who else was on the premises on the morning of October 14th, 1994? Who else was a suspect in this case? And was anyone else who was a suspect caught before Christopher Goins? And did that person who was a suspect make an initial statement to law enforcement officers? And then, after that person was charged, did that person make a different statement to the law enforcement officers? And subsequently, did that person make a third statement to the law enforcement officers that might be inconsistent with the prior two statements? Were there drugs found on the person of any of the victims; and were there drugs found in the system of any of the victims? And after looking for all these facts in an effort to

answer all those questions, do any of the facts suggest a motive different from any motive that might have been suggested by that time by the Commonwealth in this case. And if so, does that motive suggest something differently about what happened on the 14th of October?

**15.** The prosecution did not call Scott as a witness, presumably because he was wounded by a gunshot shortly before trial.

**16.** Scott made an initial statement to police in which he indicated that he saw Goins or Goins' car as he was leaving the Jones home that morning, but did not see Goins himself in the house. In a later statement, he said that he was present with Goins in the house that morning and saw Goins shoot Daphne Jones and James Randolph, Jr., in the kitchen. In addition, his statements to the police were contradictory in certain minor details (*e.g.,* whether or not he went to the store to buy pickled pigs' feet at Tamika's request that morning).

■ Trial counsel's failure to present evidence to which counsel alludes in opening statements does not, in and of itself, constitute ineffective assistance as a matter of law. *See Turner v. Williams,* 35 F.3d 872 (4th Cir.1994), *overruled on other grounds by O'Dell v. Netherland,* 95 F.3d 1214 (1996) ("In our view, assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is virtually unchallengeable."). Even if trial counsel's opening statement explicitly promises to present certain evidence during trial, which is not the case here, if the decision not to present the promised evidence is motivated in any way by tactical considerations or strategy, it is highly unlikely to be held ineffective. *See id.; United States v. McGill,* 11 F.3d 223, 227 (1st Cir.1993); *United States ex rel. Schlager v. Washington,* 887 F.Supp. 1019, 1026 (N.D.Ill.1995), *aff'd sub nom. Schlager v. Washington,* 113 F.3d 763 (7th Cir.1997).

■ Evidence of Scott's presence in the apartment on the morning of the murders was introduced at trial, but Attorney Johnson did not introduce evidence of the contradictory statements given by Scott to the police, despite the fact that his opening statement suggested that such evidence would be introduced. Presumably, at the time of his opening statement, Attorney Johnson expected the prosecutor to call Scott as a prosecution witness and planned to introduce evidence of the inconsistent statements to impeach Scott on cross-examination. When the prosecution failed to call Scott as a witness, ample strategic reasons justified trial counsel's decision not to call Scott to the stand. Most significant in this regard is that Scott's testimony was very likely to be quite damaging to the defense, given that in his most recent statement to the police he said that he had seen Goins shoot Daphne Jones and James Randolph, Jr. If Scott had so testified, he would have provided the only eyewitness testimony that Goins committed the murders, since Tamika simply testified that she saw Goins shoot her and her sister Kenya, who survived. While calling Scott would have allowed counsel to introduce evidence as to Scott's contradictory statements, his violent history, his cooperation with the police, and his drug dealing, counsel apparently concluded, quite reasonably, that the damaging testimony Scott would probably provide far outweighed any possible benefit of this evidence. The soundness of this conclusion is, if anything, strengthened by the fact that none of the inconsistencies between Scott's version of events and Tamika's version of events were material, and thus Scott's story would have done little to cast doubt on Tamika's testimony.

Nor is it true that the failure to call Scott as a witness completely deprived Goins of a defense. Without calling Scott as a witness, defense counsel was nevertheless able to argue that no trial witness saw the actual murders, that Scott was in the apartment at the time of the murders, and that drugs were found on James Randolph, Jr., and in the bloodstream of Daphne Jones, thus suggesting an alternative motive for the killings. Attorney Johnson also was able to argue that while the five who were killed suffered shots to the head at close-range, Tamika and Kenya were not shot in the head and were shot from some distance away, thus suggesting that different individuals might have been responsible for the two sets of shootings and potentially casting doubt on the probative value of Tamika's identification of Goins as the person who shot her and Kenya. In summary, trial counsel's decision not to call Scott had a sound trial strategy basis and did not preclude the argument that Scott, not Goins, was the murderer. Clearly, this is not an instance in which a failure to produce evidence could produce no conceivable benefit for the defense. *Cf. Griffin v. Warden,* 970 F.2d 1355, 1358 (4th Cir.1992) (holding that a failure to call alibi witnesses constituted ineffective assistance when no tactical considerations could have motivated the decision); *Harris v. Reed,* 894 F.2d 871, 877 (7th Cir.1990) (holding that failure to call unbiased witnesses who identified a

suspect other than defendant fleeing the scene of the crime was ineffective assistance of counsel). The decision whether to call Scott as a witness necessitated the weighing of risks and returns that is an intrinsic part of defense counsel's choice of strategy. Such weighing should not be labeled ineffective assistance merely because the choice of strategy has been unsuccessful. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Matthews v. Evatt,* 105 F.3d 907, 918 (4th Cir.1997). Goins' challenge to trial counsel's failure to present evidence regarding Scott must fail.

b. *Medical testimony concerning gunshot wounds to the fetus.*

■■■ At trial, Dr. Kay, a medical examiner who performed autopsies on several of the victims, gave a detailed description of the gunshot wounds to Tamika's fetus in response to the prosecutor's questioning. In addition, Dr. Sugarman, Tamika's treating physician, testified that the fetus was dead when removed, having suffered gunshot wounds through the head and face. Trial counsel did not object to the prosecutor's questions or the doctors' testimony in this regard.[17] Goins now argues that trial counsel's failure to object to this line of questioning amounts to constitutionally ineffective assistance because it incorrectly and prejudicially suggested that, if Goins shot Tamika, he was legally and morally responsible for a death (*i.e.,* the death of the fetus) as a result of that shooting. Yet, Goins was charged with the malicious wounding of Tamika, and the testimony was relevant to the extent of Tamika's injuries, going to show Goins' intent to maim, disfigure, disable, or kill, an element of malicious wounding. *See* Va.Code. § 18.2–51. While the testimony was arguably inflammatory, there is no reasonable probability that trial counsel's failure to object to it led to Goins' conviction or capital sentence given the compelling circumstantial evidence that Goins had mur-

dered two adults and three small children immediately prior to shooting Tamika and her sister. Goins has thus failed to show prejudice on this point.

c. *Drug offense testimony.*

Goins claims that trial counsel improperly allowed the prosecutors to ask a defense witness whether he sold drugs for Goins. When the question was initially asked, trial counsel objected and the question was rephrased. Goins claims that counsel should also have objected to the rephrased question and asked for a mistrial or a cautionary instruction. Yet, on direct appeal, the Supreme Court of Virginia held that the rephrased question was proper cross-examination on the issue of bias. *Goins,* 251 Va. at 465, 470 S.E.2d at 129. Given this, Goins has shown no error on the part of his attorneys in this instance, much less prejudicial error. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (requiring that a defendant show that trial counsel made errors so serious that he or she was not functioning as the "counsel" required by the Sixth Amendment).

d. *Trial counsel failed to object to the admission of the cartridge found at Monique Littlejohn's apartment.*

■■■ At trial, Detective Woody testified that he went to Monique Littlejohn's apartment at the request of Diza Royall, Littlejohn's mother. In this regard, he stated:

> At that particular time, Monique Littlejohn's mother, Diza Royall, was inside Monique Littlejohn's bedroom; and she was going through the dressers; and she was picking things up off the floor. And Mrs. Diza Royall picked up a .45 cartridge from the side of Monique Littlejohn's bed in the corner there and gave it to me; and I in turn gave it to Detective Barton.

Detective Woody testified that he then saw Detective Barton take the cartridge to the

---

**17.** In response to a previous objection by trial counsel, the trial court had ruled that while photographs of the fetus would be excluded, testimony concerning the wounds Tamika had suffered, including that she had been pregnant, where she was shot, and that she lost the fetus, could be admitted.

police property room. Detective Barton and the detective who took the bullet from the police property room to the firearms laboratory for examination also testified as to their control of the bullet. Ms. Royall did not testify. Trial counsel did not object to the admission of the cartridge. Contrary to Goins' contention, trial counsel's failure to object was reasonable since Officer Woody's testimony was sufficient to establish the necessary first link in the chain of custody. Under Virginia law, the "purpose of the chain of custody rule is to establish that the evidence obtained by police was the same evidence tested." *Robertson v. Commonwealth,* 12 Va.App. 854, 406 S.E.2d 417, 419 (1991). Ms. Royall's testimony was not necessary to make this showing. Thus, Goins here fails to show error of counsel, as required by *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

> e. *Trial counsel failed to request a cautionary instruction concerning the victim's fetus.*

■ Goins argues that trial counsel's failure to request a jury instruction prohibiting the jury from considering the death of the fetus in their deliberations was prejudicial to him. Assuming, *arguendo,* that this failure to request a limiting instruction fell below professional standards of assistance, given the overwhelming evidence against Goins there is no reasonable probability that it was this failure that led the jury to convict him of five counts of murder or sentence him to death. *Cf. Gilbert v. Moore,* 134 F.3d 642, 649–50 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 103, 142 L.Ed.2d 82 (1998) (finding erroneous instruction harmless in light of overwhelming evidence).

> D. *Claim XVII: "Goins received ineffective assistance of counsel at sentencing."*
>
> a. *Failure to present mitigating evidence.*

Goins challenges counsel's failure to present various mitigation evidence available at sentencing. In the sentencing phase of his trial, counsel introduced the testimony of Paulette Dickerson, Goins' cousin, who testified as to (i) Goins' close relationship with his grandmother, (ii) Goins' mother's drug abuse and violent history, and (iii) the fact that Goins had not received "nurturing" from his mother. Two other relatives spoke about their love for Goins and their belief that he was a good person. Goins challenges trial counsel's failure to present evidence regarding his psychiatric and neurological condition, evidence regarding his medical and psychiatric history, and further evidence establishing the abuse and neglect he suffered at the hands of his mother.

■ Through their affidavit, trial counsel respond that they selected the evidence to introduce in support of their theory of mitigation for strategic reasons. Specifically, the attorneys state that they did not call Dr. Nelson to testify about his psychological evaluation of Goins because, by the conclusion of the guilt phase of the trial, Dr. Nelson could no longer confidently state that Goins did not present a future danger. As a result, his testimony under cross-examination could have significantly damaged the defense's mitigation case. Further, counsel elected to call only a few family members to testify as to Goins' difficult childhood and his affection for his family because many other family members interviewed were uncooperative, drug addicts, or otherwise reasonably judged to be poor mitigation witnesses. Indeed, many family members stated that Goins was a "spoiled brat." Trial counsel chose to call those witnesses who presented themselves as credible, law-abiding members of society and who could offer testimony about Goins' upbringing without disparaging him. In addition, it is likely that trial counsel decided not to present the available evidence regarding Goins' psychiatric and medical history because this evi-

dence was not particularly compelling.[18] Trial counsel's decision not to present this evidence could well have been motivated by fear that they would alienate the jury if they suggested that childhood visits to the emergency room for breathing problems and fevers mitigated Goins' responsibility for the murders that he had just been found guilty of committing.

Counsel's strategic decisions in this regard were reasonable. *See Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir. 1991) (finding reasonable trial counsel's decision not to call psychiatrist to testify in sentencing proceeding when damaging findings could have been brought out on cross-examination and trial counsel's decision not to call certain family members because of their unreliability). The *Strickland* standard mandates considerable deference to trial counsel's strategic choices, whether or not those choices are ultimately successful.

b. *Failure to render effective closing argument*

■■■ Goins challenges the effectiveness of the closing arguments presented by Attorney Hansen in the sentencing phase of trial, contending that the arguments were brief, conceded guilt, and evidenced a bias against Goins. Goins further alleges that the closing argument in the separate capital sentencing proceeding failed to emphasize Goins' deprivations in childhood and the lack of violence in his background, but instead improperly evoked sympathy for the murder victims. In fact, Attorney Hansen's closing arguments did not concede guilt, but merely expressed respect for the jury's verdict. She acknowledged that it was difficult to contemplate the murder of children, but she also asked that the jury spare Goins' life, stressing that

Goins was very young, that he had no history of violence, and that he had grown up in difficult circumstances. Counsel's recognition of the hideousness of the crime does not alone evidence unprofessional bias against her client. *See Watkins v. Angelone,* No. 97–9, 1998 WL 2861 at *8, 133 F.3d 920 (table) (4th Cir. Jan. 7, 1998), *cert. denied* —— U.S. ——, 118 S.Ct. 1351, 140 L.Ed.2d 507 (1998) (holding that counsel's argument that "the vilest among us is still a human being" not deficient in that counsel was attempting to appeal to the jury's sympathy to spare defendant's life); *Cf. McDougall v. Dixon,* 921 F.2d 518, 537 (4th Cir.1990) ("The more cruel and vicious the facts, the more difficult the lawyer's task in presenting an effective argument for mercy. Desperate facts may require a desperate argument or unusual approach [in closing argument] . . . ."). The closing argument offered by trial counsel—which acknowledged the harsh facts of the crime, but presented Goins as young, troubled, and without a violent past—did not fall below reasonable professional standards under *Strickland. See* 466 U.S at 687–91, 104 S.Ct. 2052.

E. *Claim XVIII: "Goins received ineffective assistance of counsel with regard to his counsel's selection of Dr. Nelson*[19] *and his counsel's interaction with and supervision of Dr. Nelson."*

■■■ According to Goins, Dr. Nelson's report failed to accord adequate weight either to various of Goins' psychiatric features, or to Goins' family history. Goins further alleges that Dr. Nelson failed to undertake adequate diagnostic testing. Based on these allegations, Goins attempts to transform complaints about his

---

**18.** Goins suffered from asthma as a child and was taken to the emergency room for treatment only when his breathing difficulties reached a critical point. In addition, he was admitted to the hospital multiple times during childhood for fevers, earaches, and the like, and at age seven, Goins was sent for a psychiatric analysis because of his emotional

problems as a result of a broken home and because of his adjustment and learning problems in school.

**19.** The allegation that counsel were ineffective in selecting Dr. Nelson as a mental health expert is examined and rejected, *supra* at 653– 54.

expert's performance into a claim of constitutionally ineffective assistance of counsel by his contention that his trial counsel were ineffective for failing to undertake independent development of mental health evidence relevant to the sentencing determination and for failing adequately to supervise and direct Dr. Nelson's examination and report. In effect, Goins appears to criticize trial counsel for failing to second-guess the work of their qualified expert and substitute their lay conclusions for his expert opinions. Even assuming flaws in Dr. Nelson's report, Goins forecasts no evidence suggesting that his attorneys' failure to pinpoint and correct such flaws constituted deficient assistance. Attorneys are generally not required to second-guess their experts' examinations or opinions. *See Pruett v. Thompson,* 996 F.2d 1560, 1573–74 (4th Cir.1993) (finding no defect in counsel's performance regardless of whether the expert witness made mistakes and noting that "[a]n attorney is not required to be an expert in psychiatry"); *Poyner v. Murray,* 964 F.2d 1404, 1418 (4th Cir.1992) (holding that there was no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel and the deficiencies in the performance of experts are not to be automatically imputed to the performance of counsel). Regardless of whether Dr. Nelson's report was flawed, counsel's reliance upon the report in this instance appears to have been wholly reasonable.

Goins next suggests that trial counsel unethically edited the expert's report, thus creating a conflict of interest that prevented the attorneys from calling Dr. Nelson as a witness. The record does not support any charge of unethical conduct. Trial counsel did not act improperly in offering editorial suggestions, which the expert was free to accept or reject. Moreover trial counsel's affidavit clearly states that the fact that they gave Dr. Nelson suggestions as to what information to include in his written report had absolutely no impact on their decision as to whether or when to use him as a witness. Trial counsel's aver-

ment in this regard is convincingly corroborated by Dr. Nelson's letter, attached to trial counsel's affidavit. In this letter, Dr. Nelson states that he is reluctant to testify at the sentencing hearing, explaining that he has, over the course of the trial, concluded that Goins might well present a risk of future dangerousness. Given this, trial counsel's decision not to call Dr. Nelson to the stand was a manifestly reasonable tactical choice, which, under *Strickland,* should not be second-guessed by a reviewing court. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

■ Finally, Goins argues that trial counsel were ineffective in failing to challenge the constitutionality of Virginia Code § 19.2–262.3:1(D), which requires the production of a mental health expert's report if the mental health expert is to testify at trial. This argument fails because such a challenge would be groundless, as this provision has repeatedly been found constitutional. *See, e.g., Savino v. Murray,* 82 F.3d 593, 604–05 (4th Cir.1996). Counsel do not render constitutionally ineffective assistance where, as here, they refrain from challenging as unconstitutional a statute the constitutionality of which has been explicitly and repeatedly upheld. *See, e.g., King v. Greene,* No. 97–28, 1998 WL 183909, at *14, 141 F.3d 1158 (table) (4th Cir. Apr. 20, 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 4, 141 L.Ed.2d 765 (1998).

*F. Claim XIX: "Trial counsel failed to raise the issue of interference in the attorney-client relationship by a cooperating informant."*

■ While Goins was in prison awaiting trial, Dexter Coffin, a fellow inmate, approached prosecutors with information received from Goins that he felt would be helpful to the prosecution. Goins alleges that prosecutors agreed to postpone disposition of the charges against Coffin until after Goins' trial and agreed that Coffin should continue to obtain information from Goins about his case and provide that information to the prosecution. In reliance on these allegations, Goins argues that his

trial counsel knew or should have known that the prosecutors would try to obtain a jailhouse confession and should have taken precautions against this by investigating the background of those inmates who had access to Goins. Goins further contends that trial counsel should have explained to him the importance of not speaking to other inmates about his case or the offenses.

This claim is meritless; it has nothing to do with Goins' convictions or sentence. Coffin was not called as a witness in Goins' trial and Goins points to no information used by prosecutors at trial that he claims was provided by Coffin. So, it seems that even if counsel's failure to investigate other inmates with whom Goins had contact could be termed an unreasonable breach of professional standards, which it cannot, Goins nonetheless fails to meet the *Strickland* test because he alleges no facts from which prejudice could be inferred. *See Strickland*, 466 U.S. at 692–696, 104 S.Ct. 2052.

G. *Claim XX: "Trial counsel failed to move to withdraw after the conflict between Goins and trial counsel became apparent."*

■ According to Goins, Coffin undermined Goins' relationship with his attorneys by discouraging him from cooperating with them and by asserting that Goins' attorneys were incompetent and would try to hurt him, thus creating a conflict of interest that should have forced his trial counsel to withdraw. Trial counsel state in their affidavit that they were aware of letters Goins had allegedly written to Coffin in which he expressed dissatisfaction with his representation, but when they confronted Goins with these accusations, he refused to verify their accuracy and expressed no complaint or objection regarding his continued representation by trial counsel. Trial counsel further aver that Goins was always pleasant in their meetings with him, was never hostile or uncooperative, and never expressed dissatisfaction with their representation. Goins nowhere contradicts these assertions by

trial counsel. This claim therefore fails, for *Strickland* makes clear that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691, 104 S.Ct. 2052. Accordingly, given that Goins never demonstrated any distrust or dissatisfaction to his counsel about his representation, counsel's conclusion that they had no conflict with their client was reasonable. *See id.*

H. *Claim XXI: "Trial counsel failed to adequately communicate and share critical information with each other."*

Goins makes the conclusory assertion that trial counsel's delineation of duties at the time of their appointment—giving Attorney Johnson primary responsibility for the guilt phase of the trial and Attorney Hansen primary responsibility for the sentencing phase—compromised counsel's ability to represent Goins effectively by leading to a breakdown of communication between attorneys. This specious claim is unsupported in fact or principle. Nothing in the record supports the factual claim of a communications breakdown. Nor is it improper or unprofessional for trial counsel to allocate trial responsibilities. To the contrary, such an allocation is entirely appropriate and indeed typical. Thus, Goins has failed to allege conduct falling below objectively reasonable professional standards. Moreover, Goins fails to allege how any putative failure of communication between his attorneys affected his trial or sentencing or prejudiced the result. Without a showing of inadequate assistance and prejudice, Goins cannot succeed on this claim. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

I. *Claim XXXIV: "Appellate counsel rendered ineffective assistance of counsel."*

a. *Failure to raise on direct appeal various constitutional errors.*

■ The two-prong *Strickland* test applies to claims of ineffective assistance

of appellate counsel. *See Smith v. South Carolina,* 882 F.2d 895, 896 (4th Cir.1989). Thus, a petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that the petitioner was thereby prejudiced. *See id.* A failure by appellate counsel to raise arguably meritorious issues on direct appeal does not alone constitute objectively unreasonable performance. *See Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Indeed, "[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from incompetence, is the hallmark of effective appellate advocacy." *Smith,* 882 F.2d at 899. Such "winnowing" only constitutes performance falling beneath objective standards of reasonableness when appellate counsel neglects to raise an issue that is both "obvious" and "significant,"[20] while pursuing issues that are clearly and significantly weaker.[21] As discussed below, in no instance does Goins show that counsel failed to raise an obvious and significant issue on appeal.

*i. Goins was denied the assistance of a competent, independent, and confidential mental health expert.*

Goins alleges no facts showing that Dr. Nelson was incompetent or biased or that his appointment violated the due process requirements set out in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *See supra* at 653–54. There is, therefore, no basis for Goins' argument that this was an "obvious" and "significant" issue that appellate counsel should have raised on appeal.

*ii. Goins was denied his right to an impartial jury by selection of the venire from Gloucester County.*

 The trial court granted Goins' motion for a change of venue due to pretrial publicity in Richmond and ordered that jury venire be called from Gloucester County, a primarily white community outside of Richmond. Goins argues that this deprived him of a venire constituting a fair cross-section of the community where the crime occurred and that appellate counsel's failure to advance this point rendered their representation ineffective. Yet, courts have held that a change of venue to a locality with a venire that includes few or no minorities does not violate a black defendant's constitutional rights. *See Mallett v. Bowersox,* 160 F.3d 456, 460 (8th Cir.1998); *Epps v. Iowa,* 901 F.2d 1481, 1483 (8th Cir.1990); *Maryland v. Brown,* 426 F.2d 809, 810 (4th Cir.1970). The only authority directly supporting Goins' position that such a transfer works a denial of equal protection is the dissent filed by Justices Marshall and Brennan in *Mallett v. Missouri,* 494 U.S. 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). This is hardly adequate to establish that a constitutional claim challenging the selection of venire was "significant" or "obvious." As a result, appellate counsel's failure to raise the claim on appeal does not constitute ineffective assistance.

*iii. Goins was denied his rights to an impartial jury by the empaneling of Jurors Hogge, Dickey, and Anderson.*

As discussed *supra* at 654–56, the record does not support Goins' claims that the challenged jurors were biased against him. It follows that the failure to raise this claim on appeal did not constitute ineffective assistance of counsel.

*iv. Prospective jurors were improperly dismissed for cause in violation of Goins' right to an impartial jury.*

As discussed above, *see supra* at 656–57, the record does not support Goins' claims that prospective jurors were improperly dismissed for cause. Thus, the failure to

**20.** *United States v. Butler,* No. 97–7299, 1999 WL 25555, at *2, 172 F.3d 45 (table) (4th Cir. Jan. 22, 1999), *citing Kelly v. United States,* 29 F.3d 1107, 1112 (7th Cir.1994).

**21.** *See Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994), *followed in United States v. Fox,* No. 94–6710, 1996 WL 359574, at * 2, 91 F.3d 135 (table) (4th Cir. June 28, 1996).

raise this argument on appeal was not ineffective.

### v. The trial court failed to discharge its duty to select a fair and impartial jury.

As discussed in greater detail *infra* at 668–71, Goins has not alleged facts demonstrating that the trial court failed to discharge its duty to select a fair and impartial jury. His attorneys cannot be said to have rendered constitutionally ineffective assistance for failing to raise a groundless issue on appeal.

### vi. Goins was improperly absent from critical phases of the trial.

Goins claims that his absence from bench conferences during the trial compromised his constitutional rights. While a defendant has a due process right to be present at all stages of a trial when his presence has a reasonably substantial relation to his opportunity to defend against the charge, "this privilege of presence is not guaranteed when presence would be useless or the benefit but a shadow." *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Measured by this standard, Goins' claim fails. He has pointed to no bench conference where his absence was material to the fairness of the trial or where his presence would have provide more than a "shadow" of a benefit. Thus, appellate counsel's decision not to raise this claim on appeal did not constitute ineffective assistance of counsel.

### vii. Prosecutorial misconduct interfering with the attorney-client relationship denied Goins his rights to due process and equal protection, effective assistance of counsel, and protection against cruel and unusual punishment.

As noted, trial counsel had no indication from Goins of any conflict in the attorney-client relationship. As a result, the alleged prosecutorial misconduct was not "obvious," and appellate counsel was not constitutionally deficient for failing to raise the issue.

### viii. The prosecution failed to disclose relevant, exculpatory evidence.

Because, as discussed *infra* at 674–76, it is not established that the prosecution failed to disclose relevant, exculpatory evidence and because any claim that the evidence in question was subject to such disclosure would have required a significant extension of existing constitutional precedent, this claim was not so "significant" and "obvious" that appellate counsel should be held ineffective for failing to raise it. *See, e.g., Royal v. Netherland,* 4 F.Supp.2d 540, 562 (E.D.Va.1998) (holding that appellate counsel could not be deemed ineffective for failing to raise an argument on appeal for which there was no direct authority in the case law).

### ix. Virginia's mandatory review of the death sentence violates the constitution in that Goins was not given notice of the factors the court would use in determining proportionality.

Virginia's system of proportionality review has been repeatedly upheld in the face of constitutional challenge. *See, e.g., Buchanan v. Angelone,* 103 F.3d 344, 351 (4th Cir.1996), *aff'd,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Given such consistent controlling precedent, counsel's failure to raise this claim can hardly be deemed constitutionally ineffective assistance, since any attempt to raise this claim would surely be futile.

### b. Failure to develop and present effectively a claim concerning appropriateness of imposition of the death sentence.

Goins submits that appellate counsel failed to raise properly the argument that Goins' death sentence was disproportionate to his crime. Specifically, Goins argues that his attorneys should have collected the records of other felony capital cases in Virginia to support the argument that the punishment to which Goins was sentenced was disproportionately harsh. Goins makes no showing, however, as to how the collection of these records would

have demonstrated that his sentence was disproportionate. Respondent points out that Goins was found guilty of having murdered five persons in one incident, more than any other Virginia defendant in modern times, suggesting that appellate counsel would have been unable to make a showing of disproportionate sentencing, even if the attempt had been made. Given this, the failure to raise this issue on appeal does not constitute ineffective assistance; Goins has not demonstrated that counsel's decision to omit this argument from the appeal fell below objective standards of reasonableness or that he was prejudiced thereby. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

### 2. Jury selection

The Supreme Court of Virginia dismissed Goins' state habeas claims alleging constitutional flaws in his trial's jury selection procedures based on the rule of *Hawks v. Cox*, 211 Va. 91, 175 S.E.2d 271 (1970), which establishes that state habeas review is not available for claims previously raised by appellate counsel and rejected by the Supreme Court of Virginia. *See Goins v. Warden*, No. 22814 (Va. May 5, 1997). The Fourth Circuit has ruled that application of *Hawks* does not bar federal habeas review of claims that may otherwise be properly considered. *See Correll v. Thompson*, 63 F.3d 1279, 1289 n. 8 (4th Cir.1995). Thus, since Goins' jury selection claims are exhausted and are not procedurally defaulted, they are properly reviewed on the merits in this proceeding. Such review is constrained by the requirements of 28 U.S.C. § 2254(d), which provides that no relief can be granted on claims considered on their merits by state courts unless the state court determination was contrary to or involved an unreasonable application of clearly established federal law. Of course, "[w]here .. there is

no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record." *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998). In these circumstances, "the distinction between de novo review and 'reasonableness' review becomes insignificant." *Id.; see also Wilson v. Moore*, 178 F.3d 266, 280 (4th Cir.1999).

Yet, even de novo review is not unconstrained. Under the "new rule" doctrine, subject to narrow exceptions,[22] relief that was not compelled by precedent at the time when his conviction became final cannot be extended to Goins in federal habeas proceedings. *See Graham v. Collins*, 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); *O'Dell v. Netherland*, 95 F.3d 1214, 1222–23 (4th Cir.1996), *aff'd*, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). Relief is "compelled" by precedent when "it would have been objectively unreasonable, under the law existing at that time, for a judge to reach a contrary result." *O'Dell*, 95 F.3d at 1223.

### A. Claim IV: "The trial court failed to discharge its duty to select a fair and impartial jury."

Trial counsel sought individual voir dire in this case. The trial court first ruled that potential jurors would be questioned in groups of three. Over defense counsel's objection, the size of the groups was later increased to five. After twenty potential jurors were questioned in this manner, the trial court ruled, *sua sponte* and over defense counsel's objection, that potential jurors would be questioned in groups of thirteen. The trial court made this ruling despite the fact that midway through the jury selection process, a witness testified that the potential jurors waiting outside

---

**22.** Retroactive application of a new rule is permitted if it (i) "places a class of private conduct beyond the power of the State to proscribe or addresses a substantive categorical guarantee accorded by the Constitution" or (ii) "announce[s] watershed rules of crimi-

nal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Graham v. Collins*, 506 U.S. 461, 477–78, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (internal citations and quotation marks omitted).

the courtroom were discussing the answers to give in response to voir dire questions. Thereafter, the trial court sporadically asked the groups of jurors whether they were giving false answers in order to be selected or rejected, but no such questions were asked of the jurors who had already been chosen or dismissed. Goins argues that in these circumstances, especially given the extensive pretrial publicity, individual voir dire was necessary to preserve Goins' rights to a fair and impartial jury.

■ The voir dire procedure used in this case was not ideal; it is generally preferable to question prospective jurors individually where there is any concern that a prospective juror might be significantly influenced by the response of another or where the disabling knowledge of one, gained through pretrial publicity for instance, may infect or disable another. But under current precedent, these considerations do not rise to a constitutional level. The Fourth Circuit has noted that it "is well-established that a trial judge may question prospective jurors collectively rather than individually." *United States v. Bakker*, 925 F.2d 728, 734 (4th Cir.1991). Although the case in which the Fourth Circuit made this assertion was one in which the trial court provided for individual questioning of a juror whose initial responses suggested such private questioning was necessary, *see id.*, neither this circuit nor any other has ever held that such individual questioning is constitutionally required in cases of extensive pretrial publicity. While the Fourth Circuit, reviewing a federal district court's jury selection procedures on direct appeal, has subscribed to the view that if the court determines that any juror has been exposed to prejudicial pretrial publicity, that juror "must be examined, individually and outside the presence of the other jurors to determine the effect of the publicity." *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir.1974), it has never spoken to whether such safeguards are constitutionally required of state courts, rather than simply observed as a matter of prudent procedure in federal courts. Thus, the rule which Goins champions—that individual voir dire is constitutionally mandated in capital cases with extensive pretrial publicity—is not a rule that was "dictated by precedent" at the time Goins' conviction became final. *Graham*, 506 U.S. at 467, 113 S.Ct. 892. Thus, to grant relief on this count would require the creation of a new rule of constitutional law, which is not permissible in these collateral proceedings. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) ("[W]e will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court."); *Teague v. Lane*, 489 U.S. 288, 309, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ("Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.").

B. *Claim V. "The trial court unconstitutionally impaired Goins' ability to conduct voir dire by denying him the opportunity to mail a questionnaire to potential jury members."*

At a pretrial hearing on May 4, 1995, Goins' counsel sought permission to mail a questionnaire to all potential jurors, which request the trial court denied. A week later, counsel renewed the motion and submitted as additional support a letter from a "jury selection expert" detailing the need for a questionnaire to ensure that jurors provided accurate and candid answers. This renewed motion met the same fate. These facts do not give rise to a constitutional claim. Not surprisingly, Goins proffers no authority for the assertion that he has a constitutional right to conduct voir dire through a questionnaire. *But see Mu'Min v. Virginia*, 500 U.S. 415, 425, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (noting that juror questionnaires are flawed in that they give counsel and the court no exposure to the demeanor of the witness in answering questions). As the Supreme

Court has repeatedly affirmed, "the trial court retains great latitude" in conducting voir dire, *id.* at 424, 111 S.Ct. 1899, and "a great deal must, of necessity, be left to its sound discretion," *Ristaino v. Ross,* 424 U.S. 589, 594, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). The process through which Goins' voir dire was conducted was constitutionally adequate. *Cf. Mu'Min,* 500 U.S. at 425–26, 111 S.Ct. 1899 (noting that particular questions are constitutionally required in voir dire not when they might be helpful, but only when the failure to ask these questions renders the trial fundamentally unfair). Accordingly, this claim fails.

C. *Claim VI: "The trial court erred in denying additional peremptory challenges."*

■ The trial court granted Goins five peremptory challenges in total, one more than required by Virginia statute. *See* Va.Code § 19.2–262. According to Goins, the trial court's denial of his request for four additional peremptory challenges violated his right to a fair and impartial jury under the Sixth, Eighth, and Fourteenth Amendments. Yet, as the Supreme Court has held in a capital case, "[b]ecause peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). As a result, a defendant is denied a "right" to peremptory challenges in a state criminal proceeding only when he or she "does not receive that which state law provides." *Id.* In this instance, Goins received more than state law provides, and thus has been denied no right.

D. *Claim VII: "The trial court improperly limited questions during voir dire."*

The trial court refused to permit Goins' trial counsel to ask various questions during voir dire.[23] These included questions

**23.** The questions refused were the following:

What activities, if any, are you involved with at present for your church, temple, or other religious organization?

Have you ever been a member of an organization, religious or otherwise, that has taken a position opposed to legalized abortions? If so, what?

Have you personally taken a position in opposition to legalized abortions?

Are you a member of any organization, religious denomination, or other group that has taken a position in support of the death penalty?

Which political party do you usually support?

Have you or a member of your family, or any close friend, ever had an opportunity to see the inside of a prison, jail, or other correctional facility?

What are your impressions of the ability of psychologists or psychiatrists to understand the human mind?

What are your views as to the major causes of crime in our society?

Have you ever experienced fear of a person of another race? If so, what were the circumstances?

Do you think that African–Americans are more likely to commit crimes than whites? If so, why?

Tell us what your views are about the death penalty and why.

Why is the death penalty a good idea or not a good idea?

What is your opinion about the philosophy of "an eye for an eye" as it concerns the use of the death penalty as a punishment for murder?

What types of situations do you think the death penalty might be appropriate for? In such situations, do you think the death penalty should always be imposed?

Do you think that imprisonment for life is a severe enough penalty for someone who has been convicted of any type of murder? Would the age of such a convicted person affect your thinking?

Where do your feelings about the death penalty come from? Have your feelings about it changed over the years?

Is your feeling about the death penalty strong enough to affect your vote in favor of or against a political candidate because of his or her opinion on the death penalty?

Occasionally one reads in the newspaper, or hears on T.V. news, about a person sentenced to death who was later found to be

addressing jurors' experiences with the criminal justice system, their religious and political affiliation, their views on mental health professionals, their beliefs about the causes of crime, and the rationale behind their beliefs about the death penalty. The trial court also refused to permit questions about race, since the case did not involve interracial crime. Also, the trial court did not allow trial counsel to ask jurors what their verdict had been on previous criminal juries and whether they had "ever seen the inside of a jail." [24] On direct appeal, the Supreme Court of Virginia addressed the question on the merits and held that the questions permitted during voir dire were sufficient to preserve Goins' constitutional right to a fair and impartial jury and that the trial court did not abuse its discretion in refusing the additional questions. This determination on the merits may not be overturned on federal habeas review unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

No such unreasonable application of federal law has occurred in this instance. The voir dire limitations were entirely reasonable and in no way improper in the circumstances. Trial courts "retain[ ] great latitude in deciding what questions should be asked on voir dire." *Mu'Min,* 500 U.S. at 424, 111 S.Ct. 1899. In addition, "the State's obligation to the defendant to empanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Ristaino,* 424 U.S. at 595, 96 S.Ct. 1017. Here, it was proper for the trial court to disallow various cumulative questions concerning jurors' attitudes about the death penalty, when the subject had been adequately covered by other questions. In addition, the questions about jurors' community involvement, impressions of mental health professionals, and experiences with the criminal justice system were in no way constitutionally required.

As noted, trial counsel also sought to ask jurors whether they had ever experienced fear of a person of another race and whether they thought that African–Americans were more likely to commit crimes than whites. To be sure, it is settled that the Constitution entitles a defendant accused of interracial capital crime to have prospective jurors informed of the victim's race and questioned on the issue of racial bias. *See Turner v. Murray,* 476 U.S. 28, 35–36, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). But this has no application here, as both Goins and the victims were African–American. Moreover, no Supreme Court or Fourth Circuit decision has held that capital defendants accused of crimes against victims of their own race have a right to question prospective jurors on the issue of racial bias.

It is also a settled constitutional requirement that defense counsel may question jurors as to their racial attitudes during voir dire when "special circumstances" indicate that racial issues are "inextricably bound up with the conduct of the trial." *See Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). Here, Goins asserts that such special circumstances existed because he was being tried by an almost all-white jury pool from rural Gloucester County and because there was evidence that some potential jurors had given false answers during voir dire. This argument is unconvincing, as "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic group," *id.* at 190, 101 S.Ct. 1629, presumably even when a jury pool is predominantly white. In addition, there is no

---

innocent. How does that fact affect your opinion about the death penalty?

Why do you think we are asking all these questions about the death penalty?

**24.** Attorney Johnson was permitted to ask jurors whether they had sat on juries in the past, whether those juries had been able to reach a unanimous verdict, and whether they had ever had a relative who had been incarcerated.

evidence or offer of evidence that any jurors gave false answers to disguise racial prejudice, and thus the allegation that jurors were lying does not suggest that racial issues were "inextricably bound up in the trial." *See id.* at 189, 101 S.Ct. 1629. In sum, because there was no "clearly established" constitutional obligation to permit the requested questions during voir dire,[25] the Supreme Court of Virginia's resolution of the question was reasonable and Goins' claim fails.

## 3. Parole Eligibility

The Supreme Court of Virginia dismissed Goins' state habeas petition claims regarding parole eligibility under *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970). *See Goins v. Warden,* No. 22814 (Va. May 5, 1997). As these claims have previously been decided on the merits on direct appeal, they are subject to review in this court pursuant to 28 U.S.C. § 2254(d). Because the Supreme Court of Virginia resolved these claims without written analysis,[26] the distinction between § 2254(d) "reasonableness" review and de novo review is insignificant in this context. *See Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491.

> A. *Claim X: "The trial court erred in not allowing Goins to question jurors about parole during voir dire."*

▆ Goins's trial counsel asked the trial court to allow questioning of prospective jurors concerning their perceptions or understanding of the role parole might play in the case. Specifically, trial counsel wanted to ascertain whether prospective jurors understood the meaning of a life sentence in Virginia, namely that if Goins

were convicted of a Class 1 felony in Virginia and sentenced to two or more life sentences, he would not be eligible for parole consideration until he had served 30 years in prison. *See* Va.Code § 53.1–151(D). The trial court rejected this request. Relying on studies finding that most people believe a capital defendant will only serve seven to ten years in prison if sentenced to a life term,[27] Goins now argues that the trial court's refusal to permit inquiries as to jurors' perceptions of a life sentence deprived him of a fair and impartial jury, since it left him unable to determine which jurors held mistaken impressions regarding the meaning of a life sentence in this case. This contention is ultimately unpersuasive.

In *Simmons v. South Carolina,* 512 U.S. 154, 171, 178, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Supreme Court held that as a matter of due process, a capital defendant must be permitted to instruct the jury that he is parole ineligible if the prosecution argues that he presents a future danger. Nevertheless, the Fourth Circuit has repeatedly held that this ruling does not require that a capital defendant be given the opportunity to instruct the jury as to his actual parole eligibility when he is *not* ineligible for parole. *See Wilson v. Greene,* 155 F.3d 396, 407 (4th Cir.1998), *cert. denied sub nom. Wilson v. Taylor,* — U.S. ——, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998); *Fitzgerald v. Greene,* 150 F.3d 357, 367 (4th Cir.1998), *cert. denied,* — U.S. ——, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998). This result is consistent with Justice O'Connor's *Simmons* concurrence, where she concluded that in a capital case where "parole is available, the Constitution does not require (or preclude) jury consideration of that fact."[28] *Simmons,* 512

---

25. 28 U.S.C. § 2254(d)(1).

26. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 122 (1996).

27. *See* William W. Hood, III, Note, *The Meaning of Life for Virginia Jurors and Its Effect on Reliability in Capital Sentencing,* 75 Va.L.Rev. 1605 (1989); Anthony Paduano & Clive A. Stafford Smith, *Deathly Errors: Mispercep-*

*tions Concerning Parole in the Imposition of the Death Penalty,* 18 Colum.Hum.Rts.L.Rev. 211 (1987).

28. The significance of Justice O'Connor's concurrence is enhanced by the fact that it was joined by two other Justices and provided the dispositive votes necessary to sustain the judgment.

U.S. at 176, 114 S.Ct. 2187. While neither the Supreme Court nor the Fourth Circuit has addressed whether a parole-eligible defendant must be permitted to address jurors' understanding of parole eligibility during the voir dire process, there is no reason in principle to distinguish between the right to explore the issue during voir dire and the right to treat the issue through jury instructions.[29] The same considerations are operative in both contexts and the same rule should apply. Since the Constitution sets no requirement for jury consideration of parole where, as here, a defendant is eligible for parole, and since Virginia has determined that jury consideration of parole in this context is inappropriate, Goins had no constitutional right to raise and pursue the issue during voir dire. A contrary conclusion would require the announcement of a new constitutional rule, and such new rules are not available as bases of relief in federal habeas proceedings. See Graham v. Collins, 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); O'Dell v. Netherland, 95 F.3d 1214, 1222–23 (4th Cir.1996), aff'd, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

B. Claim XXII. "Goins' rights under the Eighth and Fourteenth Amendments were violated by the exclusion of evidence of parole eligibility."

Goins argues that he should have been permitted to introduce mitigating evidence during his capital sentencing proceeding regarding his ineligibility for parole for thirty years and the statistical likelihood that he would commit no violent crimes when age fifty-two or older, the earliest time at which he might be paroled. He rests this claim on the Eighth Amendment's prohibition of cruel and unusual punishment and the Equal Protection Clause of the Fourteenth Amendment.[30]

■ Goins' Eighth Amendment argument merits close review. He contends that since the Constitution requires that few restrictions be placed on the evidence a capital defendant is permitted to introduce in mitigation, evidence regarding the amount of time that he would actually spend in prison if sentenced to a life term must be permitted. He argues that such evidence and the inferences that could be drawn from it "might serve as a basis for a sentence less than death," and thus "may not be excluded from the sentencer's consideration," Skipper v. South Carolina, 476 U.S. 1, 4–5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and points out that "the mere declaration that evidence is 'legally irrelevant' to mitigation cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death." McKoy v. North Carolina, 494 U.S. 433, 441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Goins' contention that a sentencing jury must be permitted to consider the length of time a defendant will actually serve in prison finds support in Simmons, 512 U.S. at 163, 114 S.Ct. 2187, which recognizes that the actual length of time served in prison is "indis-

---

**29.** The Fifth Circuit has rejected a claim like that Goins advances here. See King v. Lynaugh, 850 F.2d 1055 (5th Cir.1988) (en banc) (holding that trial judge's refusal to allow capital defendant in voir dire to question jurors or educate them regarding state parole law, when defendant, if sentenced to life imprisonment, would not be eligible for parole for twenty years, did not violate defendant's Sixth or Fourteenth Amendment rights to a fair and impartial jury).

**30.** The Equal Protection claim rests on the observation that if Goins' criminal history were more extensive, rendering him ineligible for parole under Virginia law, he would have been entitled under Simmons to inform the jury of this ineligibility. Goins argues that the distinction made between persons without criminal records and persons with significant criminal records in this circumstance is irrational and so violates Equal Protection, in that if favors those with extensive criminal records. Goins misstates the distinction drawn by the Supreme Court, in that Simmons distinguishes between defendants based not on criminal history but parole eligibility. The latter is clearly a rational distinction, in that parole-eligible and parole-ineligible capital defendants are not similarly situated in their potential to commit future crimes.

putably relevant" to assessments of a defendant's future dangerousness. Thus, Goins' argument is not without force. Nevertheless, it is ultimately unavailing, since habeas relief is not available if that relief depends on a new rule of constitutional law that was not dictated by precedent at the time defendant's conviction became final. The Fourth Circuit has explicitly held that were a court to find that the Eighth Amendment requires that a defendant be permitted to inform a jury of his actual parole eligibility or ineligibility, such a rule would be "new," rather than dictated by previous precedent. *See O'Dell v. Netherland,* 95 F.3d 1214, 1238 n. 13 (4th Cir.1996), *aff'd,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). Thus, Goins cannot succeed on his Eighth Amendment claim, and it must be dismissed. Neither is his Equal Protection claim supported by precedent, and so it must suffer the same fate.

C. Claim XXIII: "The due process clause required that the jury be presented with evidence of Goins' ineligibility for parole."

As noted, *Simmons,* 512 U.S. at 154, 114 S.Ct. 2187, holds that as a matter of due process, a capital defendant must be permitted to instruct the jury that he is parole ineligible if the prosecution argues that he presents a future danger. Goins contends that the *Simmons* rationale is equally applicable in his situation (where if sentenced to a life term, he would not be eligible for parole for thirty years) as in the case where the defendant, if sentenced to life imprisonment, will never be eligible for parole. As a result, he argues, he was entitled to a jury instruction that set out the number of years he would serve in prison before being eligible for parole if sentenced to a life term. As noted above, however, the Fourth Circuit has repeatedly and expressly rejected this proposition, limiting the *Simmons* holding to those cases in which a defendant will never become eligible for parole. *See Wilson,* 155 F.3d at 407; *Fitzgerald,* 150 F.3d at 367. This claim therefore fails.

## 4. *Brady* Claims

On direct appeal, the Supreme Court of Virginia denied Goins' claims that the prosecution failed to disclose material, exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 123–24 (1996). They are subject to review in these proceedings pursuant to the "reasonableness" requirements of § 2254(d).

A. Claim XIII: "The prosecution failed to produce certain evidence in violation of Brady and the court's discovery order and presented a false theory of the case."

a. Results of Barry Scott's polygraph examination.

In December 1994, Barry Scott underwent a polygraph examination in which he answered questions about his participation in the murders. While the prosecutor disclosed a transcript of this examination to the defense prior to trial, the results of the examination were not revealed. Goins alleges that statements made by the prosecutor after Goins' conviction revealed that Scott failed the polygraph examination, and he argues that the results of this examination were therefore exculpatory evidence that should have been disclosed to defense counsel.

*Brady,* 373 U.S. at 87, 83 S.Ct. 1194, holds that a defendant's due process rights are violated when the prosecution suppresses evidence material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution in so acting. Evidence is "material" under Brady "only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew,* 516 U.S. 1, 5, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (per curiam). In Virginia, polygraph results are inadmissible both on the question of guilt or innocence and for impeachment purposes. *See, e.g., Robinson*

*v. Commonwealth,* 231 Va. 142, 341 S.E.2d 159, 167 (1986). The Supreme Court has held that under such legal regimes, polygraph results are "not 'evidence' at all." *Wood,* 516 U.S. at 6, 116 S.Ct. 7. This is because "[d]isclosure of the polygraph results ... could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses." *Id.* Thus, the polygraph results were material only if their disclosure would have been "reasonably likely" to result indirectly in a different trial outcome—for instance, if disclosure would have led trial counsel to conduct additional discovery that would have led to important admissible evidence. *See id.* at 6–8, 116 S.Ct. 7. In this instance, it is unlikely that trial counsel's strategy would have been significantly different had they learned that Scott failed the polygraph examination, if in fact he did.[31] Goins' attorneys had already decided to base their defense on the theory that Scott was the murderer, in reliance on Goins' representations to them that Scott did the killings. Even without the polygraph results, counsel had ample motivation to investigate this theory. It does not appear that the polygraph results would have assisted trial counsel in marshaling their evidence or arguments. Thus, it does not seem that there is any reasonable likelihood that disclosure of the results would have changed the outcome of the trial.

 Goins further argues that *Brady* required disclosure of the polygraph results because they were or should have been admissible in the sentencing phase as relevant mitigating evidence. Goins' support for this contention is *Rupe v. Wood,* 93 F.3d 1434 (9th Cir.1996), a decision holding that a Washington state trial court erred when it excluded evidence of polygraph results from a capital sentencing proceeding. The Ninth Circuit's conclu-

sion in *Rupe,* however, is undermined by the Supreme Court's recent holding in *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998), which concluded that a *per se* rule completely prohibiting admission of polygraph results as evidence did not violate a defendant's constitutional rights. Although not a capital case, *Scheffer,* with its emphasis on the unreliability of polygraph evidence and the interest of courts in excluding such unreliable evidence, certainly suggests that exclusion of polygraph results would pass constitutional muster in this context, as well. *See id.* at 1265–66. In short, under current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings. Given this, the Supreme Court of Virginia's determination that the prosecution was not required to disclose the polygraph results to Goins was reasonable under existing Supreme Court precedent and cannot be disturbed here. *See* 28 U.S.C. § 2254(d).

### b. Statements by Tamika Jones.

At Monique Littlejohn's trial, which occurred after Goins had been tried and convicted, Tamika Jones testified that Goins had been happy about her pregnancy and had convinced her not to have an abortion. She also stated that Littlejohn had behaved "like a friend" to her from July 1994 until the time of the shootings in October of that year. Despite the fact that Tamika's testimony in the Littlejohn trial postdated Goins' own trial and conviction, Goins argues, incoherently, that this information should have been divined by prosecutors and provided to trial counsel, since it cast doubt on the motive for the shootings proposed by the prosecutors, namely that Goins was angry about Tamika's pregnancy because of the difficulties it caused him with his girlfriend, Littlejohn.[32] Goins in no way substantiates his apparent

---

**31.** The current record does not reveal whether Scott in fact failed his polygraph examination or, if he failed, what statements he made were judged to be untruthful.

**32.** Goins included this claim in his state habeas petition; the Supreme Court of Virginia apparently did not address it on the merits, as this claim is not one of those listed as dismissed under *Slayton v. Parrigan,* 215 Va. 27,

illogical assumption that prosecutors knew at the time of his trial all statements that Tamika would later make about the crime and the events leading up to it. The record does not reflect that prosecutors were in possession of this allegedly exculpatory information at the time of Goins' trial.

 Moreover, respondent correctly points out that if the prosecution "withheld" evidence of Goins' reaction to Tamika's pregnancy, this cannot be a constitutional violation since the information withheld was in Goins' possession. *See Hoke v. Netherland,* 92 F.3d 1350, 1355 (4th Cir.1996) (stating that when the exculpatory information is available to the defendant, the defendant is not entitled to the benefit of the *Brady* doctrine). Additionally, the evidence regarding Littlejohn's relationship with Tamika prior to the shootings is both immaterial and in no way contradictory to Tamika's testimony at trial; thus, there is no reasonable possibility that if the evidence had been disclosed to trial counsel, the results at trial would have been different. *See id.* at 1357. The fact that Goins' girlfriend was friendly to Tamika does little or nothing to undermine Tamika's eyewitness identification of Goins as the person who shot her and Kenya or the inference that he shot the rest of her family as well, which follows from this identification, the fact that Tamika heard a single set of footsteps and gunshots before Goins appeared, and the evidence that all the shots fired that morning came from the same gun. This claim is meritless.

### c. *Impeachment evidence concerning Parrish Davis.*

Parrish Davis testified at trial that a week before the murders, Goins told him that he wanted to kill Tamika and her family. Goins now alleges that prosecutors knew at the time of trial that Davis had committed numerous crimes, including embezzlement, and that at the time of his testimony Davis hoped for lenient treatment and immunity from prosecution for these crimes. Because prosecutors failed to disclose this information, Goins states, the defense was unable to impeach Davis's credibility with evidence of his felonious conduct and his expectation of benefit from his testimony. Respondent answers with an affidavit from David Hicks, the Commonwealth's Attorney, stating that the prosecution "made no promises of any kind, including leniency or immunity, to Parrish Davis in return for his trial testimony" and that prosecutors were "not aware of any criminal record of Davis, criminal activity or investigations for which promises could be made to him." Goins forecasts no facts contradicting this affidavit. Thus, this claim must be dismissed as meritless.

### 5. Evidentiary Decisions

These claims were considered by the Supreme Court of Virginia on direct appeal, but in its decision the court did not address the constitutional dimension of the evidentiary claims. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 126 (1996). Nor did the court do so on consideration of the state habeas petition, for there it dismissed the claims under the rule of *Hawks v. Cox,* 211 Va. 91 175 S.E.2d 271 (1970). *See Goins v. Warden,* No. 22814 (Va. May 5, 1997). Therefore, these claims are reviewed de novo. *See, e.g., Weeks v. Angelone,* 176 F.3d 249, 257–58 (4th Cir.1999).

205 S.E.2d 680 (1974), or *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970), nor can it be one of the "remaining" claims dismissed under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as it is not an ineffective assistance of counsel claim. In those instances in which the merits of a properly presented claim have not been addressed by the Supreme Court of Virginia

either on direct review or in state habeas proceedings, the claim is reviewed de novo. *See, e.g., Weeks v. Angelone,* 176 F.3d 249, 257–58 (4th Cir.1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, ... our review of questions of law and mixed questions of law and fact is de novo.").

A. Claim XIV: *"The trial court improperly admitted testimony and physical evidence that was designed to inflame the jury and resulted in a sentence based on the influence of passion, prejudice, and other arbitrary factors."*

 Goins challenges the admission of sixty-five photographs of the victims and crime scene and the 911 tape in which Tamika reported the shootings and stated that "Pops" (Goins) was the shooter. This challenge must be considered with the awareness that "a claim about the admissibility of evidence under state law rarely is a claim upon which federal habeas corpus relief can be granted." *Spencer v. Murray,* 5 F.3d 758, 763 (4th Cir.1993). The exception to this rule arises under those "extraordinary circumstances" when the admission of evidence impugns fundamental fairness or infringes specific constitutional protections. *Bunch v. Thompson,* 949 F.2d 1354, 1365 (4th Cir.1991); *see also Spencer,* 5 F.3d at 763.

 Goins argues that the photos of the victims were designed to inflame the jury and prejudice the defendant. The Supreme Court of Virginia found on direct review that the photographs were relevant evidence, demonstrating the nature of the wounds and the position of the victims after they were shot. *See Goins,* 470 S.E.2d at 126. Because such evidence is typically relevant, "[t]he introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." *Jacobs v. Singletary,* 952 F.2d 1282, 1296 (11th Cir.1992). In this instance, the relevant photographs were not so inflammatory as to render the proceeding constitutionally defective. *See generally Bunch,* 949 F.2d at 1365 (finding admission of photograph of victim on autopsy table not fundamentally unfair); *Kuntzelman v. Black,* 774 F.2d 291 (8th Cir.1985) (finding admission of "particularly gruesome" autopsy photographs of victim and victim's organs not fundamentally unfair); *Slade v. Taylor,* 689 F.Supp. 595 (E.D.Va.1988), *aff'd,* 872 F.2d 419, 1989 WL 29623 (4th Cir.1989) (finding admission of graphic photographs of victim's injuries did not impugn fundamental fairness).

 Goins also objects to the tape of the 911 call because Tamika's statement that "Pops" shot the rest of her family was not based on first-hand observation. He argues that admission of this identification absent Tamika's actual knowledge violated his due process rights. The Supreme Court of Virginia correctly ruled that Tamika's statement, based upon her first-hand knowledge of the screams, the gunshots, the single set of steps in the hallway, and the identity of her attacker, was admissible under the "excited utterance" hearsay exception. *See Goins,* 470 S.E.2d at 125–27. Admission of this evidence clearly did not violate Goins' due process rights.

**6. Unadjudicated Conduct**

Goins' unadjudicated conduct claim was previously rejected by the Supreme Court of Virginia on the merits on direct appeal, and thus is subject to review in this court only pursuant to 28 U.S.C. § 2254(d). Of course, as discussed previously, since the Supreme Court of Virginia resolved these claims without written analysis, *see Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 122 (1996), the distinction between § 2254(d) "reasonableness" review and de novo review is insignificant in this context. *See Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998).

A. Claim XXIV: *"Goins' death sentence was substantially based on unadjudicated allegations of criminal misconduct in violation of his rights to due process and against cruel and unusual punishment."*

During Goins' sentencing proceeding, prosecutors introduced evidence showing that he had previously been arrested for possession of crack cocaine with intent to distribute and that he had fled the courthouse prior to his trial on this charge, for

which flight a bench warrant had been issued. Goins was never tried on the drug charge or the bench warrant. As a result, he argues that introduction of evidence of these crimes during sentencing violated his due process rights.

■ This argument is unconvincing, for when there is no indication that the evidence of prior unadjudicated crimes is plainly unreliable, courts have generally allowed introduction of this evidence in capital sentencing proceedings. *See, e.g., Richardson v. Johnson,* 864 F.2d 1536, 1541 (11th Cir.1989); *Pruett v. Thompson,* 771 F.Supp. 1428, 1443 (E.D.Va.1991), *aff'd,* 996 F.2d 1560 (4th Cir.1993). Here, the evidence of the prior unadjudicated criminal conduct was provided by a police officer, who testified to finding fifty-five grams of crack cocaine on Goins' person during a consensual search and who was present when Goins fled the courthouse prior to trial. Nothing suggests that this testimony was unreliable, and thus its admission violated no constitutional right of Goins'. Any holding that such admission trammels a defendant's due process rights would requires a significant extension of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Habeas relief under such a new rule is not available to Goins. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997); *Teague v. Lane,* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989).

### 7. Sufficiency of the Evidence

On direct appeal, the Supreme Court of Virginia rejected Goins' claim that the evidence was insufficient to support his conviction. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 130 (1996). This decision must stand unless it rests on an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d).

*A. Claim XXVII: "The evidence was insufficient as a matter of law."*

■ Goins argues that in light of the new evidence presented in his petition, the evidence was insufficient as a matter of law to convict him. Goins offers no authority to support his contention that this claim should be reviewed in light of the evidence presented in his habeas petition rather than the evidence presented at trial. Indeed, no authority exists for this contention. To the contrary, the proper standard is "whether the record evidence [before the jury] could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In any event, even if the evidence introduced in Goins' habeas petition were to be considered, ample evidence still exists permitting a rational factfinder to conclude beyond a reasonable doubt that Goins committed the crimes for which he was found guilty. *See id.*

### 8. Alleged Perjury and Unlawful Search

These claims, although included in Goins' state habeas petition, were not addressed by the Supreme Court of Virginia in its order denying the petition. *See Goins v. Warden,* No. 228144 (Va. May 5, 1996). Nor were they addressed on direct appeal. *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114 (1996). Thus, they are reviewed de novo here.

*A. Claim XXVIII: "Certain prosecution witnesses were untruthful in their testimony."*

Goins asserts "upon information and belief" that the prosecution knew or should have known that certain prosecution witnesses committed perjury. Specifically, Goins alleges that the police officer's testimony that Littlejohn's mother found a .45 caliber cartridge at Littlejohn's apartment was false, and the cartridge was not in fact found there or delivered to the police by Littlejohn's mother. Rather, Goins sug-

gests, the cartridge was found by police during an unlawful search. Goins offers no facts to support this speculation, seeking instead the opportunity to conduct discovery and to retain the services of an investigator to develop this claim. A wholly speculative claim unsupported by any offer of proof does not entitle Goins to any relief, including an opportunity to retain an investigator or pursue discovery. *See, e.g., Daniels v. United States,* 54 F.3d 290, 293 (7th Cir.1995) (holding that an evidentiary hearing need not be provided to a habeas petitioner who makes conclusory or speculative allegations rather than specific factual allegations); *Lavernia v. Lynaugh,* 845 F.2d 493, 500 (5th Cir.1988) (holding that a federal habeas court need not "blindly accept speculative and inconcrete claims" as a basis upon which to order an evidentiary hearing).

### B. Claim XXIX: "The prosecutors failed to disclose evidence of an unlawful search."

Goins claims that the prosecutors' actions in failing to disclose evidence of the illegal search alleged above denied Goins due process of law in violation of the Fifth and Fourteenth Amendment. This claim fails factually and legally. First, the record is devoid of any evidence of an illegal search; the affidavit of the prosecutor and the sworn trial testimony of the investigating officer are to the contrary. Moreover, respondent correctly states that there is no prosecution duty to turn over evidence of an illegal search merely because the search is illegal;[33] rather, the prosecution's duty, if it offers such evidence, is to demonstrate its admissibility where the defense seeks to suppress. No such motion was made in this case. Indeed, Goins has introduced no authority holding that the prosecution's withholding of evidence of an illegal search, as opposed to the

prosecution's withholding of exculpatory evidence, violates a defendant's constitutional rights. The suppression rule serves ends different from the *Brady* rule, and there is no reason to assume that they should be subject to the same legal regime. Any holding that the prosecution must turn over evidence of an illegal search to the defense would clearly constitute a new rule, and no relief can be extended under a new constitutional rule in federal collateral review. *See Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); *O'Dell v. Netherland,* 95 F.3d 1214, 1222–23 (4th Cir.1996), *aff'd,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). In any event, respondent also correctly notes that even if the cartridge found during the allegedly illegal search were suppressed, there is no reasonable probability that Goins would have been acquitted or sentenced differently, given that Tamika Jones provided eyewitness testimony that Goins was the shooter, forensic evidence showed that every shot was fired from the same gun, a firearms expert testified that the bullets were likely filed from a Glock pistol, and a Glock pistol instruction manual was found in Goins' girlfriend's apartment next to a pile of men's clothes. Thus, Goins has failed to show the requisite prejudice. *See generally United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### 8. Constitutionality of Sentencing Statute

### A. Claim XXXI: "Virginia's capital sentencing statute is unconstitutional."[34]

Goins claims that the Virginia capital sentencing statute relies upon unconstitutionally vague aggravating factors, thus inviting the arbitrary imposition of the death

---

**33.** The prosecution's duty is to provide a defendant any exculpatory evidence in its possession. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence of an illegal search does not per se tend to exculpate a defendant.

**34.** This claim was rejected by the Supreme Court of Virginia on direct appeal and is properly reviewed pursuant to § 2254(d). *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 122 (1996).

penalty in violation of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. The Fourth Circuit, however, has affirmed the constitutionality of the "vileness" and "future dangerousness" aggravating factors multiple times. *See, e.g., Bennett v. Angelone,* 92 F.3d 1336, 1344 (4th Cir. 1996); *Spencer v. Murray,* 5 F.3d 758, 764–765 (4th Cir.1993). This challenge must therefore be rejected.

### 9. The Supreme Court of Virginia's Review

A. *Claim XXXII: "The Virginia Supreme Court provided inadequate and meaningless appellate review of the appropriateness of the death penalty," and Claim XXXIII. "Failure to perform constitutionally adequate proportionality review."*[35]

■ The Supreme Court of Virginia is required by statute to review capital sentences to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. *See* Va.Code § 17.1–313. Goins argues that the review of his sentence was constitutionally inadequate because the Supreme Court of Virginia (i) ignored mitigating evidence, (ii) accorded the aggravating factors unconstitutionally broad scope, and (iii) provided no notice of how they would define "similar" cases. The first allegation is refuted by the Supreme Court of Virginia's recitation of evidence in its statement of facts, reflecting a clear awareness of the mitigating evidence in Goins' case. *See Goins,* 470 S.E.2d at 121–22. The fact that the Supreme Court did not again recite this evidence in the section of its opinion addressing proportionality review does not indicate that it took no account of it. In addition, the Supreme Court announced that it had re-

viewed the records of all its capital murder cases, giving particular attention to the 'vileness' and 'future dangerousness' findings. Based on this review, the Supreme Court found no disproportion, particularly when the number of people Goins was found to have killed was taken into account. *See Goins,* 470 S.E.2d at 131–32. In short, there is no evidence that the Supreme Court of Virginia construed the statutory terms unconstitutionally or otherwise violated Goins' due process rights. Absent such evidence, any contention that the Supreme Court of Virginia failed to perform a proper proportionality review is not reviewable in a federal habeas court. *See Fisher v. Angelone,* 163 F.3d 835, 854 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1290, 143 L.Ed.2d 382 (1999) ("[A]bsent specific evidence that the procedures used by the Virginia Supreme Court in deciding [the defendant's] appeal constituted an independent due process violation, we will not entertain [the defendant's] contention that the Virginia Supreme Court failed to follow Virginia law.").

### 10. Constitutionality of Death Penalty

A. *Claim XXXV: "Imposition of the death penalty constitutes cruel and unusual punishment."*[36]

Goins argues that the death penalty in all circumstances is an excessive, cruel and unusual penalty. This contention has been squarely and repeatedly rejected in the courts. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Smith v. Moore,* 137 F.3d 808, 814 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998) (noting that a capital sentencing scheme satisfies the Eighth Amendment as long as it suitably channels or limits jury discretion in imposing the death penalty). Accord-

---

**35.** These claims were rejected by the Supreme Court of Virginia on direct appeal and is properly reviewed pursuant to § 2254(d). *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 122 (1996).

**36.** This claim was rejected by the Supreme Court of Virginia on direct appeal and is properly reviewed pursuant to § 2254(d). *See Goins v. Commonwealth,* 251 Va. 442, 470 S.E.2d 114, 122 (1996).

ingly, Goins is not entitled to relief on this ground.

## 11. Objection to Trial Counsel's Affidavits

*A. Claim XXXVI: "Trial counsel's affidavits are illegal and improper."*

Goins objects to consideration of trial counsel's affidavits executed for the state habeas corpus proceeding. As respondent points out, however, he does not allege constitutional error, but simply raises a generalized objection to the wisdom of a state law that permits consideration of this evidence. Because this objection has no constitutional basis, it states no grounds for habeas corpus relief.

## VI. Conclusion

For all the reasons stated above, petitioner's motion for an evidentiary hearing must be denied and the petition must be dismissed in full. Accordingly, the stay of execution entered by Order dated September 11, 1997, must be vacated. An appropriate order will enter.

The Clerk is directed to forward this Memorandum Opinion to all counsel of record.